***FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER***

Electronically Filed
Supreme Court
SCWC-15-0000841
31-AUG-2018
09:11 AM

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

ARTHUR BIRANO,
Petitioner/Petitioner-Appellant,

vs.

STATE OF HAWAIʻI,
Respondent/Respondent-Appellee.

SCWC-15-0000841

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-15-0000841; S.P.P. NO. 09-1-0040; CR. NO. 01-1-1154)

AUGUST 31, 2018

McKENNA, POLLACK, and WILSON, JJ., WITH NAKAYAMA, J.,
DISSENTING, WITH WHOM CIRCUIT JUDGE AYABE, IN PLACE OF
RECKTENWALD, C.J., RECUSED, JOINS

OPINION OF THE COURT BY POLLACK, J.

In the latest chapter in this long-running case arising from an alleged 2001 robbery, we consider a prosecutor's disclosure obligations with respect to evidence relevant to the credibility of a government witness. For his involvement in the incident, the petitioner in this case was convicted of a range of crimes based in part on the testimony of a codefendant who

elected to testify for the State following an improper ex parte meeting between the judge, prosecutor, and codefendant's counsel. Petitioner now seeks post-conviction relief, alleging that an undisclosed, off-the-record agreement existed between the codefendant and prosecutor under which the codefendant received a favorable recommendation at sentencing in exchange for his testimony.

On review, we hold that the credible testimony during petitioner's post-conviction hearing clearly indicates that an arrangement existed in which the codefendant expected to benefit from his testiony, and that the nondisclosure of this arrangement deprived petitioner of a fair trial with respect to several of his convictions. We also provide guidance as to a prosecutor's constitutional obligations when a government witness provides testimony of a material fact that the prosecutor knows to be false or misleading. We vacate the Circuit Court of the First Circuit's order denying petitioner's petition for post-conviction relief, as well as those convictions and sentences that may have been reasonably affected by the nondisclosure, and we remand the case for further proceedings.

## I.     FACTS AND PROCEDURAL HISTORY

### A.    Circuit Court Trial

On May 24, 2001, a grand jury of the Circuit Court of the First Circuit (circuit court) indicted codefendants Arthur Birano, Nicolas Nakano, and Bryce Takara on the following charges: robbery in the first degree in violation of Hawaii Revised Statutes (HRS) § 708-840(1)(b)(ii) (count one);[1] kidnapping in violation of HRS § 707-720(l)(e) (count two);[2] and burglary in the first degree in violation of HRS § 708-810(1)(c) (count three).[3]  Birano was also indicted on five counts of

---

[1]      HRS § 708-840(1)(b)(ii) (1993 & Supp. 2000) provides as follows:

        A person commits the offense of robbery in the first degree
        if, in the course of committing theft:

            . . .

            (b) The person is armed with a dangerous instrument
        and:

                . . .

                (ii) The person threatens the imminent use of
        force against the person of anyone who is present with
        intent to compel acquiescence to the taking of or escaping
        with the property.

[2]      "A person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to: . . . [t]errorize that person or a third person[.]"  HRS § 707-720(l)(e) (1993).

[3]      HRS § 708-810(1)(c) (1993) provides as follows:

        A person commits the offense of burglary in the first
        degree if the person intentionally enters or remains
        unlawfully in a building, with intent to commit therein a
        crime against a person or against property rights, and:

        . . .

                                    (continued . . .)

firearm-related offenses, including two counts of possession of a prohibited firearm in violation of HRS § 134-8(a)[4] (counts four and six); two counts of ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes in violation of HRS § 134-7(b) and (h)[5] (counts five and seven); and one count of carrying, using or threatening to use a firearm in the commission of a separate felony in violation of

---

(. . . continued)

> (c) The person recklessly disregards a risk that the building is the dwelling of another, and the building is such a dwelling.

[4]   HRS § 134-8(a) (1993) provides in relevant part as follows:

> (a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134-4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; . . . and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.

[5]   HRS § 134-7 (Supp. 2000) provides in relevant part as follows:

> (b) No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

> . . .

> (h) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. . . .

HRS § 134-6(a) and (e)[6] (count eight).  The charges involved an incident in which, the State alleged, Birano, Nakano, and Takara demanded property from Frederick Dumlao while threatening him with a firearm, walked Dumlao to his apartment and forced him to unlock it, and entered Dumlao's apartment without his consent with the intent to take property from the apartment.

On July 26, 2002, Nakano pleaded no contest to the charges of robbery in the first degree, kidnapping, and burglary in the first degree.  The plea form stated that Nakano had not been promised "any kind of deal or favor or leniency by anyone for his plea."[7]

Prior to Nakano's sentencing and approximately one month before Birano's trial, on August 13, 2002, Lori Wada, the assigned prosecutor, filed a motion for extended terms of

---

[6]     HRS § 134-6 (Supp. 2000), which has since been recodified, provided in relevant part as follows:

> (a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not . . . . .
>
> . . .
>
> (e) Any person violating subsection (a) . . . shall be guilty of a class A felony. . . .

[7]     Takara also pleaded no contest to the charges of robbery in the first degree, kidnapping, and burglary in the first degree; on his plea form, Takara similarly indicated that there had been no promise of "any kind of deal or favor or leniency by anyone for [his] plea."

imprisonment in Nakano's case. The motion sought extended terms of life imprisonment for Nakano as to counts I and II and twenty years of imprisonment as to count III. In support of the motion, Wada declared the following: Nakano was a "multiple offender" within the meaning of HRS § 706-662(4)(a); Nakano was out on bail when he committed the charged offenses; Nakano had an extensive criminal history; Nakano's criminality had continued despite his prior contacts with the criminal justice system; Nakano had demonstrated a total disregard for the rights of others and a poor attitude toward the law; the pattern of criminality demonstrated by Nakano indicated that he was likely to be a recidivist; and Nakano posed a serious threat to the public.

A motion for extended term was not filed by the prosecutor in Takara's case, who would have qualified for an extended term under the same statute.[8] See HRS § 706-662 (Supp. 1999). Trial in Birano's case commenced on September 18, 2002.[9] A summary of the relevant evidence adduced at trial follows.

---

[8] Takara was not called by the State as a witness in Birano's trial.

[9] The Honorable Sandra A. Simms presided over the trial and sentencing.

6

### 1.    Dumlao's Testimony

Prior to commencement of Dumlao's testimony, the court granted the State's request to preclude defense counsel from asking Dumlao questions pertaining to the presence of drugs in the apartment in which Dumlao lived, the furnishing of drugs by Dumlao to a third person, and whether Dumlao was in debt for drug-related transactions. The court concluded that these questions would lead Dumlao to assert his Fifth Amendment right against self-incrimination.

Dumlao testified that on May 16, 2001, at approximately 6:20 a.m., he, his then-girlfriend Cari-Ann Casil, and his friend Brian Enos were unloading laundry baskets from Dumlao's vehicle in the parking lot of his apartment when a red Camaro drove up behind the vehicle. Dumlao stated that he saw three males, including Birano, exit the red Camaro. One of the two males with Birano was wearing a ski mask, Dumlao testified.[10] Dumlao said that Birano approached him, pointed a gun in his direction, and directed him to open his safe--at which time Casil and Enos ran off. Birano was about an arm's length from him, according to Dumlao, when Birano pointed the gun at him.

---

[10]    Although Dumlao did not identify which of the men wore the mask, Nakano would later testify that he wore a ski mask during the initial parking lot confrontation.

Dumlao stated that he told Birano he did not have a safe but nonetheless led the three men up to his apartment.

Dumlao explained that from the parking lot to the front door of the apartment, he did not feel free to leave because he felt frightened by the fact that Birano was holding a gun. While walking up the stairs to the apartment, Dumlao testified, he did not know where the gun was because Birano was behind him. When they reached the front door of the apartment, Dumlao stated, his neighbors Rei Kobayashi and Ruben Cruz came out of their apartment and asked if he was all right. Dumlao responded that he was fine.[11]

Dumlao testified that he opened the door of the apartment because Birano told him to do so and he was afraid because Birano had a gun. Birano directed him to enter the apartment, Dumlao stated, but Dumlao refused. Dumlao related that he eventually complied because Birano said that he would shoot him if he did not enter the apartment.

Upon entering the apartment, Dumlao ran to his balcony, climbed over to his neighbor's balcony, and slid down to the first floor. After he exited the apartment, Dumlao

---

[11] Kobayashi testified that she saw the group of men when she opened her apartment door, but she did not see a gun drawn on Dumlao from where she was standing--fifteen feet away. Cruz similarly testified that he did not see a gun.

called the police. Dumlao stated that he could not recall whether anything was taken from the apartment.

Dumlao initially testified that he did not know Birano, Nakano, or Takara prior to May 16, 2001. However, Dumlao acknowledged on cross-examination that he had been introduced to Birano by his friend, Joseph Poomaihealani, prior to May 16, 2001. Dumlao nonetheless maintained that he did not recognize Birano at the time of the incident. In addition, Dumlao denied that there had been a drug transaction between Birano and himself prior to the incident in question in which Birano had given him $2,500 for drugs that he never delivered.

Dumlao testified that a videotape, obtained from a video camera installed in his apartment, accurately depicted the events that occurred on the day in question and that it did not show a gun in Birano's hand until the point at which he entered the apartment. Dumlao acknowledged that the videotape showed him walking fairly casually; he also agreed that no one touched him as he walked from the parking lot to the front door of the apartment.

In response to questions regarding why he, Casil, and Enos were doing laundry early in the morning on May 16, 2001, Dumlao explained that he was not employed at the time and was accustomed to sleeping during the day and staying up through the night. As to Casil, Dumlao testified that she frequently worked

nights, but she had not worked the evening before the incident. Dumlao also stated that he did not know whether Casil had used drugs on the morning in question, although he was aware that she was a methamphetamine user.

## 2. Nakano's Testimony

While being sworn in as a witness, Nakano invoked his Fifth Amendment right to remain silent. The deputy prosecutor, Lori Wada, expressed surprise, asked to approach the bench, and informed the court that she "had met with Mr. Nakano this morning, and it went fine. He was suppose to testify."[12] The court responded that a short recess would be taken and instructed Wada to "call [Nakano's counsel's] office. I want him here immediately. Absolutely." Wada informed the court that she could call Nakano's counsel, Myles Breiner, on his cellular phone. After Breiner appeared, Judge Simms met with Wada and Breiner in her chambers without Birano's counsel present. The meeting in chambers was not recorded.

Following the conclusion of the in-chambers off-the-record meeting with the prosecutor and Nakano's counsel, the court reconvened without the jury. Judge Simms stated that she had met in chambers with Wada and Breiner regarding Nakano

---

[12] It was subsequently disclosed that Nakano and his counsel, Myles Breiner, had met with Wada at the prosecutor's office nine days prior to Birano's trial.

invoking the Fifth Amendment and that Birano's counsel, Nelson Goo, had objected to not being present during the in-chambers meeting. Goo again asserted his objections, strenuously taking exception to what had occurred. Goo requested a mistrial--he stated that "not only was [he] precluded from being there, [he] did want to be there." Goo also stated that he did not know "what kind of exparte communication Ms. Wada had in that conference."

Judge Simms denied that the meeting constituted an ex parte communication, explaining, "This is not an exparte communication in that the Prosecutor was present. Mr. Nakano is a defendant in this case, and he's represented by counsel." Goo disputed this explanation, emphasizing that he was the defense counsel in Birano's trial. Goo reiterated that he did not know what kind of ex parte communication took place without him being present in the meeting. And even if there was no communication by Wada, Goo pointed out, "she's privy to information about a witness that she's calling that I have an absolute right to cross examine, and especially in the area of whether or not he has any self interest in this case." Goo further stated that he did not know "if there was any kind of deal struck" and that he did not know what changed Nakano's mind.

Judge Simms told Goo that when she met with Wada and Breiner, she was not informed whether Nakano was going to

testify.  Judge Simms added that if there was "any question about any deals," that was not part of the off-the-record discussion.

Goo further explained the basis for the motion for mistrial:

> this witness, Mr. Nakano, has pleaded no contest as charged to, I believe, not only in this case but in another case that he's also been charged with without any kind of deal from the Prosecution and still faces sentencing from this Court.  With that set of factors, how can the Defense here for Mr. Birano not feel that something is amiss?
>
>  We have a witness who gets up on the stand.  And, Your Honor, my opinion is that he wasn't scared.  He seemed nervous being in front of all these jury people.[13]  He was brought -- shuttled over by the Prosecutor's investigator through the back doors and in chains.  And then over the lunch break, there's a secret meeting where no representative for Mr. Birano is present.  And next thing you know, he's apparently going to testify now.

When Judge Simms indicated that she still did not know whether Nakano would testify and sought to confirm that Nakano was no longer invoking his Fifth Amendment privilege, Goo informed her that this was his understanding based on his conversation with Wada and Breiner.

Judge Simms asked Wada whether she had a response to the motion for mistrial.  Wada replied that she thought the court "made it amply clear that it was not exparte.  And given the nature and sensitivity regarding . . . Mr. Goo's client, it

_____

[13]    Judge Simms had stated that Breiner indicated during the conference meeting that Nakano was very afraid.

was clearly appropriate." Wada argued against the mistrial and requested that the trial proceed. In response, Goo again disputed that the meeting was appropriate, arguing that it violated the Hawai'i Rules of Professional Conduct because "the defense was precluded from the in-chambers meeting while Wada was present in that meeting."

Judge Simms found that "the record speaks for itself" and denied Birano's motion for a mistrial. Wada then orally moved to preclude Goo from making "any reference . . . if Mr. Nakano should take the stand, regarding his -- invoking his Fifth Amendment earlier." Judge Simms granted Wada's request, stating, "I think it's improper to question him regarding that." Goo then responded that he would "place a record objection" to the court's ruling. Goo also requested "a 104[14] hearing outside the presence of the jury with Mr. Nakano on the stand," adding, "I want to know what happened over the lunch hour." Judge Simms denied the request, saying that she did not think it was appropriate under the circumstances and that the trial would

---

[14] Hawaii Rules of Evidence Rule 104 (1984) governs "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence."

proceed.  Breiner then confirmed that Nakano was going to testify.[15]

Nakano returned to the witness stand and did not invoke his right to remain silent.  Nakano testified that he did not have a plea agreement with the State and was testifying to "tell the truth."  Nakano indicated that he had pleaded no contest to robbery in the first degree, kidnapping, and burglary, but testified that his plea was not motivated by a desire to lighten his sentence.  Nakano then denied that he "wanted to do well" in testifying in front of the judge and prosecution.  When pressed, he maintained that his decision to testify was not in any way motivated by a desire for leniency:

> Q. You're hoping that by testifying favorably for the State against my client to make him look bad that perhaps the judge will be lenient with you at sentencing; right?
>
> A. No.

Nakano admitted that he had initially asked the court for youthful offender sentencing--where he could be sentenced to an eight-year term of imprisonment instead of twenty years to life--and then stated, "[b]ut now I'm pleading No Contest."  He finally acknowledged that he was hoping for youthful offender

---

[15]    Immediately before Breiner's announcement, the court granted the State's request to instruct the media not to show Nakano's face on the news, presumably when he testified.

sentencing but did not indicate his testimony was related to this hope.

As to the incident that took place on May 16, 2001, Nakano testified that he, Takara, and Birano decided to go to Dumlao's house to "[g]et dope." Nakano first testified that the three did not discuss whether they would "buy dope or rip off dope." However, Nakano later stated that, because they had no money, he, Birano, and Takara planned to "take dope" and that the three of them had discussed this plan. They drove to the parking lot of Dumlao's apartment, Nakano testified, where Birano exited the vehicle, approached Dumlao, and pointed a gun at Dumlao's head. At the time, Nakano was wearing a face mask. Nakano testified that Dumlao looked panicked. Birano's girlfriend, who was present, ran off screaming. Birano told Dumlao to open the safe, Nakano recounted, after which Birano walked Dumlao up to the apartment, with Nakano and Takara following behind.

Nakano testified that while the four men were walking up the stairs to Dumlao's apartment, Birano's gun was "[i]n his hands," and Dumlao was not free to leave. When they reached Dumlao's apartment, Nakano stated, Birano told Dumlao to open the door and Dumlao did not respond. Nakano testified that Dumlao's neighbor came out of her apartment and asked if everything was all right, and Nakano responded in the

affirmative. According to Nakano, Dumlao, who still looked panicked, tried to walk away, but Birano "made him come back" using the gun. Nakano testified that Birano told Dumlao that he would be shot if he did not open the door to the apartment and that Birano was pointing the gun at Dumlao. Dumlao then unlocked the door and pushed it slightly open before Birano "jumped kicked it."

After Dumlao exited the apartment, Nakano stated, Birano told Nakano to search the apartment, which he did. Nakano testified that Birano and Takara were also searching the apartment, "[p]ulling out the sheets and stuff, looking underneath the bed." Not finding anything of value, Nakano, Takara, and Birano ran out of the apartment to the car. Nakano testified that he, Birano, and Takara did not take anything from the apartment because they were concerned that Dumlao was going to call the police. After leaving the apartment, Nakano recounted that he told Birano that he was worried about the police; according to Nakano, Birano told him not to worry and that he would "shoot [them] out of" the situation if the police showed up. Nakano admitted that he was high on crystal methamphetamine when the incident occurred.

### 3. Casil's Testimony

Casil testified that while she, Dumlao, and Enos were unloading laundry baskets from the vehicle around 6:30 a.m. on

May 16, 2001, a red Camaro pulled up behind the vehicle. The driver of the red Camaro, later identified as Birano, "came out pulling a gun" at Dumlao. Casil could not confirm at which part of Dumlao's body the gun was pointed and stated that she ran away and went to a neighbor's house and called the police.

When asked why she was doing laundry at 4:00 a.m., Casil responded, "Maybe because I had a lot of clothes that had built up." Casil testified that she could not recall whether she had used crystal methamphetamine on the morning of the incident but that she had tried it "a couple of times." Casil then testified that she previously used methamphetamine "a lot more"--as in "[m]ore frequently"--and that she probably did use it with Dumlao. Casil also stated that Dumlao gave her drugs and that she did not know how Dumlao obtained money for drugs, adding that Dumlao had a lot of friends. Casil further testified that Dumlao "sometimes" "just had money."

### 4. Poomaihealani's Testimony

Poomaihealani testified that he and Dumlao were close friends. Poomaihealani spoke about a conversation he had with Dumlao that occurred about one or two days after the incident. In that conversation, Dumlao admitted to Poomaihealani that the incident was his fault, explaining that he and Birano participated in a drug transaction in which he took approximately $2,000 from Birano. Dumlao also informed

Poomaihealani that he told police Birano robbed him because he did not want the police to know about the drug transaction.

### 5.  Birano's Testimony

Birano testified that he and Dumlao had engaged in an agreed-upon drug transaction two days before the incident when he gave Dumlao $2,500 for cocaine.  Dumlao did not return with the cocaine, Birano stated, and he went to Dumlao's apartment on the day of the incident to recover his money or to get the cocaine that Dumlao was supposed to provide.

Birano testified he was first introduced to Takara and Nakano on the day of the incident.  Birano related that, in response to his request for help in finding Dumlao, Nakano said that he knew where Dumlao lived, and the three of them then went to Dumlao's apartment.  Birano explained that he had a gun that day because he did not know if Dumlao would be armed and he had been held at gunpoint on a prior occasion.  When he saw Dumlao, Birano testified, he approached and demanded that Dumlao return his money.  Birano stated that he had his gun out but that he was not pointing it at Dumlao.  He put the gun away when he saw that Dumlao was unarmed, Birano testified, and he took it out again only when Dumlao refused to enter the apartment after opening the door because Birano feared someone was waiting inside as part of a "setup."  Birano testified that he did not intend to terrorize or kidnap Dumlao.  He added that he was in

Dumlao's apartment for less than one minute, he did not touch anything in the apartment, he did not threaten to shoot Dumlao, and he never fired his gun.

Birano stated that as he, Nakano, and Takara drove away from Dumlao's apartment, Nakano was "tweaking" from "smoking drugs all morning with us." In addition, Birano testified that when the police found him later that day, he fled because he knew he had violated a condition of his parole and that he was in possession of a gun.[16]

### 6.    Jury Verdict

Following the conclusion of the evidence, the jury found Birano guilty as charged on seven of the eight counts.[17] Birano was sentenced to extended terms of life imprisonment with the possibility of parole in counts one and eight; extended terms of twenty years of imprisonment in counts three, five, and seven; and extended terms of ten years of imprisonment in counts four and six. The court ordered the extended terms to run

---

[16]    An officer of the Honolulu Police Department testified that he recovered a black backpack from Birano on May 16, 2001. The following, inter alia, were found inside the backpack: an M-11 semiautomatic handgun, a magazine for the M-11 handgun, a ski mask, and a pair of sunglasses.

[17]    Count II, kidnapping, was dismissed because the jury found that the State did not prove beyond a reasonable doubt that Birano acted with separate and distinct intents in committing robbery in the first degree and kidnapping.

concurrently and also imposed mandatory minimum terms in each of the counts.

### B. Nakano's Sentencing

Following Birano's trial and prior to Nakano's sentencing, Nakano filed a motion for supervised release. On January 17, 2003, Judge Simms granted Nakano's motion for supervised release and set aside bail.

Wada and Breiner appeared as counsel at Nakano's sentencing proceeding, which was held on June 9, 2003. At the onset of the proceeding, Judge Simms indicated that she had received assurances from the Department of Public Safety (DPS) that Nakano's concerns regarding his security as it related to his and Birano's placement in prison were "given absolute priority" and would be addressed. Judge Simms also stated that she would strongly recommend to the paroling authority that Nakano be released at the earliest possible date given how well he had done on supervised release and "because of the assistance that he provided to the State in the matters involving Mr. Birano."

Breiner then addressed the court. Breiner informed Judge Simms that it was his understanding that Wada was going to withdraw the State's motion for extended term of imprisonment. Wada then orally moved to withdraw the motion for extended term of imprisonment.

As to her argument on sentencing, Wada indicated that the court had already noted "the tremendous assistance" that Nakano provided in Birano's criminal case. Wada added that, given Nakano's progress and history, the State was recommending that "Nakano be sentenced as a youthful offender for eight years with applicable credit." Wada further stated that she would appear at Nakano's parole hearing and would "be recommending a low minimum and transfer to Kulani as well."[18]

Judge Simms followed Wada's recommendation and stated to Nakano that "because of what you've done, and because of the help you've given the State, I'm going to give you the youthful offender." Judge Simms thus sentenced Nakano pursuant to the Youthful Offender Act, reducing the indeterminate term of twenty years' imprisonment to eight years.

## C. Direct Appeal

Birano appealed to the Intermediate Court of Appeals (ICA) from the circuit court's judgment filed on February 18, 2003, challenging, inter alia, the ex parte chambers conference that took place among Judge Simms, Breiner, and Wada, as well as the circuit court's ruling precluding the defense from cross-

---

[18] Kulani Correctional Facility is a minimum security prison located on the Big Island of Hawaiʻi. Kulani Correctional Facility, State of Hawaii Department of Public Safety, http://dps.hawaii.gov/about/divisions/corrections/about-corrections/kcf/ (last visited June 7, 2018).

examining Nakano on his sudden change of heart regarding testifying after the ex parte meeting.  State v. Birano, 109 Hawai'i 327, 329-30, 331, 126 P.3d 370, 372-73, 374 (App. 2005).

The ICA held that Judge Simms improperly participated in an ex parte communication--in violation of Canons 2(A) and 3(B)(7) of the Revised Code of Judicial Conduct--thereby raising a question as to the fairness of Birano's trial.  Id. at 337-38, 126 P.3d at 380-81.  Reasoning, however, that there was convincing evidence that the jury's deliberations were not biased by the undisclosed communication, the ICA determined that the ex parte meeting did not deprive Birano of his constitutional right to a fair trial.  Id. at 338, 126 P.3d at 381.  The ICA accordingly affirmed Birano's convictions.  Id. at 342, 126 P.3d at 385.

On certiorari, a three-member majority of this court held that Birano's right to a fair trial was not unfairly prejudiced and affirmed his convictions.  State v. Birano (Birano I), 109 Hawai'i 314, 322-23, 126 P.3d 357, 365-66 (2006).  Although the majority agreed that Judge Simms violated Canons 2(A) and 3(B)(7) of the Revised Code of Judicial Conduct by improperly participating in an ex parte meeting, the court found that there was nothing in the record indicating that Judge Simms made improper remarks or engaged in improper conduct during the

trial. Id. at 323, 126 P.3d at 366. The majority also concluded that the court's preclusion of the defense's questioning of Nakano regarding his motive for changing his mind about testifying was harmless error, stating that the only difference between Birano's testimony and the testimony of other witnesses was Birano's intent in going to Dumlao's apartment. Id. at 325, 126 P.3d at 368.

Justice Duffy, with whom Justice Acoba joined, issued a strong dissent. They agreed with the majority that the ex parte meeting between Judge Simms, Wada, and Breiner was improper and violated multiple canons of the Revised Code of Judicial Conduct, but disputed that the impropriety was harmless beyond a reasonable doubt. Id. at 326-27, 126 P.3d at 369-70. A "reasonable person using common sense," the dissent maintained, "would conclude that something happened in the improper ex parte communication meeting which caused Nakano to change his mind about testifying against Birano." Id. at 327, 126 P.3d at 370. The trial judge compounded its error, the dissent continued, "by (1) denying Birano's motion for a mistrial based upon the improper meeting, and (2) granting the prosecutor's motion in limine to prevent Birano's counsel from cross-examining Nakano about the meeting and his reasons for changing his mind about testifying against Birano." Id. "[I]f a mistrial was not ordered," the dissent reasoned, "basic

fairness would require that Birano be allowed to cross-examine Nakano regarding what happened at the improper meeting." Id. The dissent thus concluded that the errors involving the trial judge's improper ex parte meeting and the events that followed were not harmless beyond a reasonable doubt. Id.

### D. 2007 Petition for Post-Conviction Relief

On April 3, 2007, Birano filed a petition for post-conviction relief pursuant to Rule 40 of the Hawai'i Rules of Penal Procedure (HRPP) (Petition I). Petition I set forth eight grounds for relief. Grounds one through four asserted that the trial court violated Birano's right to be present at every stage of trial and to have counsel present at every critical stage of trial under the HRPP, the Hawai'i Constitution, and the United States Constitution. Ground five alleged that the trial court violated Birano's right to due process under the federal constitution by preventing the disclosure of exculpatory and impeachment evidence from a key witness of the State. Grounds six and seven asserted that the trial court violated Birano's right to confrontation under the Hawai'i and United States Constitutions by precluding him from cross-examining Nakano on the "improper" ex parte communication.[19] The circuit court

---

[19] Ground eight contended that the trial court violated the Sixth and Fourteenth Amendments of the United States Constitution by imposing on

(continued . . .)

denied Petition I without a hearing, finding that Birano's claims were "patently frivolous and without a trace of support either in the record or from other evidence submitted by the Petitioner."[20]

Birano appealed the denial of Petition I and thereafter moved to supplement the record on appeal with a Declaration from Nakano, which was dated August 8, 2008. In his Declaration, Nakano averred that in May 2001, he gave police a false statement that had been coerced and induced by a promise of a reduction in bail. Nakano also declared that he attempted to invoke the Fifth Amendment at Birano's trial because he did not want to lie under oath, but Wada and Breiner informed him that if he did not testify he would receive a sentence of twenty years of imprisonment instead of eight years of imprisonment. Nakano stated that he requested that the agreement of the reduced sentence in exchange for his testimony be in writing, but Wada and Breiner said it could not be done. Nakano averred that he testified at Birano's trial because of pressure from

---

(. . . continued)

Birano extended terms of imprisonment without submitting to a jury the facts underlying these terms.

[20]    The Honorable Dexter D. Del Rosario presided.

Wada and Breiner.  The ICA denied the motion to supplement the record on appeal.

On April 24, 2009, the ICA issued a summary disposition order,[21] in which it determined that there was no evidence to support Birano's claim of new evidence that Nakano's trial testimony was not truthful.[22]  This court denied Birano's application for a writ of certiorari without prejudice to Birano filing another Rule 40 petition.  Birano v. State, No. 29050, 2009 WL 2943170 (Haw. Sept. 4, 2009).

### E.    2009 Petition for Post-Conviction Relief

On September 9, 2009, Birano, proceeding pro se, filed a second Rule 40 petition (Petition II), which set forth five grounds for relief.  In ground three, Birano asserted that the trial court conducted an improper ex parte meeting in chambers with the prosecutor, Nakano, and Nakano's counsel and that Nakano's trial testimony that followed the improper ex parte meeting had been induced by pressure from the prosecutor and was not truthful.  Birano contended that by precluding the disclosure of exculpatory and impeachment evidence from Nakano,

---

[21]    The ICA's summary disposition order may be found at Birano v. State, No. 29050, 2009 WL 1102048 (Haw. App. Apr. 24, 2009).

[22]    The ICA vacated the circuit court's order denying Petition I to the extent that it denied a hearing on ground eight, in which Birano challenged the imposition of the extended term sentences; the ICA remanded the case for resentencing.

the trial court violated his constitutional right to confrontation.[23]  Attached to Petition II was an Amended Declaration from Nakano.[24]

The circuit court denied Petition II without a hearing, ruling that Birano's claims were previously ruled upon or waived.[25]  Birano appealed to the ICA.

In a summary disposition order, the ICA determined that the circuit court erred in failing to conduct a hearing on ground three of Petition II, which challenged as unconstitutional the trial court's preclusion of the disclosure of exculpatory and impeachment evidence from a key witness of

---

[23]  The other grounds for relief in Petition II were as follows. Grounds one and two alleged that the trial court violated Birano's right to be present at every stage of trial and to have counsel present at every critical stage of trial in violation of the HRPP, the Hawai'i Constitution, and the United States Constitution.  Ground four challenged the trial court's ruling precluding Birano from cross-examining the State's "key witness" on the "improper" ex parte communication.  Ground five asserted that the prosecutor committed misconduct by engaging in the "improper" ex parte communication with Nakano.

[24]  In his Amended Declaration, Nakano restated what was set forth in his first Declaration and added that at some point after he invoked the Fifth Amendment at Birano's trial, he met with Judge Simms, who confirmed that she would sentence him as a youth offender if he agreed to testify.  Nakano expressed that he testified against Birano because of pressure from not only Wada and Breiner, but also Judge Simms.  Nakano explained that his testimony at trial was false because the reason in going to Dumlao's house was to recover money that Dumlao had owed Birano; Nakano stated that there was no prior discussion regarding robbing Dumlao.  Nakano also explained that Birano had a gun because Dumlao was a known armed drug dealer.

[25]  The Honorable Dexter D. Del Rosario presided.

the State.[26]  The ICA found that Birano stated a colorable claim for relief on the grounds that his due process rights were violated because Nakano's testimony was untruthful and the result of coercion by the prosecutor.  The ICA accordingly remanded the case to the circuit court for a hearing on ground three of Petition II.

On remand, Birano was permitted to supplement Petition II to include the following additional grounds for relief: ground six, which contended that Birano's right to confrontation and right to due process were violated because the State failed to provide discovery of impeachment evidence relating to an off-the-record agreement between the State and Nakano; ground seven, which maintained that the State's failure to correct or disclose Nakano's untruthful testimony regarding the absence of a deal with the State violated Birano's rights to a fair trial and due process; and ground eight, which asserted that Birano's constitutional right to a fair trial was violated when the State improperly entered into an off-the-record agreement with Nakano that was purposely concealed from the defense.

---

[26]     The ICA's summary disposition order may be found at Birano v. State, No. 30480, 2013 WL 764880 (Haw. App. Feb. 28, 2013).

A hearing on grounds three, six, seven, and eight of Petition II commenced on January 7, 2015.[27] Among those who testified at the hearing were Breiner, Judge Simms,[28] Wada, and Nakano.

Breiner testified that he was Nakano's counsel in the underlying criminal case. He expressed that the State's case against Nakano was "very solid" and that Nakano did not have a viable defense to the charges. Prior to Birano's trial, Breiner spoke to Nakano about youth offender treatment and the advantage of cooperating. After Nakano invoked the right to remain silent at Birano's trial, Breiner received a telephone call and "had to rush over there." When he arrived, he spoke to Nakano, reiterating to him that if he testified against Birano it would improve his chances of receiving youth offender treatment.

Breiner testified that there was an unwritten "understanding" that existed between Wada and himself. Breiner drew a distinction between an "understanding" and an "agreement" or "deal."

> Q: Okay. And sometimes those are deals where the
> State's going to make a recommendation for your client at

---

[27]    The Honorable Rom A. Trader presided. At the hearing, Birano was represented by counsel.

[28]    Although Judge Simms was no longer a judge at the time of the hearing, the hearing recounted events that took place while she was a judge, and therefore she is referred to in that capacity.

sentencing but the judge is not bound by that recommendation, correct?

A: <u>You're using the word "deal." There's an understanding.</u> If that's what you mean by deal, that's a little different. <u>There's an understanding sometimes the prosecutor will make a recommendation</u>.

Q. Well, you could have -- you talked about -- you know, you talked about there was no written agreement in this case?

A: Um-hum.

Q: Correct?

A: Correct.

Q: Okay.

A: There was no agreement, period.

Q: Well, are you saying there was no written agreement or you're saying there was no agreement at all?

A: <u>There was no agreement at all. There was an understanding that if he cooperated, then the court</u> -- then the prosecutor, Ms. Wada, would take it into consideration and recommend, we were hoping, youth offender treatment. She couldn't get approval for it. She couldn't say that she had authority to do that and there was nothing in writing.

(Emphases added.) In response to whether there was a "deal" for Nakano to get youthful offender sentencing, Breiner again stated that "there was no written agreement, there was no oral agreement"--simply his belief that if Nakano testified truthfully, "the court would be inclined to grant him youthful offender treatment."

Judge Simms testified that after Nakano invoked the Fifth Amendment at Birano's trial, she met with Breiner and Wada to discuss whether Nakano was going to testify. Judge Simms stated that, during the chambers conference, she "understood"

Wada and Breiner had discussed between themselves a recommendation from the State of youthful offender sentencing in exchange for Nakano's testimony.

> Q. And is it your recollection that while there was no deal that would be -- that might be considered a Rule 11 deal --
>
> A. Um-hum.
>
> Q. -- that there <u>nevertheless was an agreement</u> between Mr. Breiner and Mr. Nakano and the State that Nakano would be testifying, <u>if he did testify, in exchange for a recommendation at sentencing from the State</u>?
>
> A. I'm -- I don't know if I would characterize it as that. I was not a party to that <u>but I understood that that's what they talked about, yes</u>.
>
> . . .
>
> Q. Okay. But your recollection is that after Nakano took the Fifth, when Mr. Breiner came down to court, <u>he and Ms. Wada were talking about this agreement that if Nakano testified truthfully against Mr. Birano, then the State would recommend at sentencing that he receive the youth act</u>, it was still up to you whether or not he would get the youth act?
>
> A. I -- I can't talk about what they discussed among themselves, if that's what they discussed, yeah.
>
> Q. Okay. But your recollection is that they were -- they were talking about that to some degree, that's what you recall, you were not a party to it but --
>
> A. They were talking about it but they were also talking about, you know, what happened as to why he wouldn't testify at that particular time.
>
> . . .
>
> Q. Okay. <u>But it's fair to say that part of what was discussed was some agreement that you were not a party to</u>?
>
> A. <u>That's fair. Yes</u>.

(Emphases added.) Judge Simms later in her testimony confirmed that there was a discussion between Wada and Breiner during the

chambers conference about an agreement between Nakano and the
State.

> Q. Okay. And you told us earlier there was some
> discussion that you were not -- you weren't privy to all
> the details but there was discussion about an agreement
> between Mr. Nakano, his lawyer, and Ms. Wada representing
> the State, correct?
>
> A. Yeah.
>
> Q. Okay. And would it be fair to say that, again,
> you weren't privy to all the details but the gist of that
> agreement was that if he, Nakano, testified against Mr.
> Birano, the State would recommend the Youthful Offender
> Act?
>
> A. I guess you could say that but yeah.

(Emphases added.)

Wada, in her testimony, denied the existence of an
agreement, explaining that she did not believe she needed
Nakano's testimony to successfully prosecute Birano. Wada
testified that, during the in-chambers meeting without Birano's
trial counsel, Breiner expressed his concern that, after Nakano
invoked the Fifth Amendment, Judge Simms would not sentence
Nakano as a youthful offender. Wada stated,

> A. . . . Breiner was very concerned that Judge Simms,
> after taking the Fifth Amendment, would not consider his
> client a candidate for Youthful Offender, and he talked to
> us about that, and he asked her "Would you still consider a
> Youthful Offender if my client testifies?"
>
> . . .
>
> Mr. Breiner's concern was because his client had
> taken the Fifth, if he did testify, would the Court be
> inclined or open to entertain a Youthful Offender
> sentencing . . . .

Wada testified that Judge Simms responded that it depended on what the State asked for and that she was "inclined" to follow the State's recommendation regarding Nakano's sentence. Wada testified as follows:

> [A]nd he asked her "Would you still consider a Youthful Offender if my client testifies?" and she told him, "Well, it's clear that he's very, very afraid of Birano and that's why we have all these sheriffs." She says, "Well, it's going to depend on what the State asks. If the State asks for it, then I'm inclined to follow it," and I told him, "I cannot tell you anything. I don't know. We don't have any plea agreement."

(Emphasis added.) Wada later reiterated in her testimony that Judge Simms stated that Nakano's sentence would depend on what the State asked for. Wada said,

> Mr. Breiner's concern was because his client had taken the Fifth, if he did testify, would the Court be inclined or open to entertain a Youthful Offender sentencing, and Judge Simms' reply was, "Well, I don't know. It depends on what the State asks," and I said, "I don't know because we don't have a plea agreement. He hasn't testified for me."

(Emphases added.)

Nakano testified that Wada had told him "that in exchange for [his] testimony against Birano [he] would get the youth act." Nakano explained that approximately a week and a half prior to Birano's trial, he was brought to the prosecutor's office, where he and Wada went over his testimony. At that time, Nakano stated that he had asked for a written plea agreement, which Wada refused. Nakano also stated that he was lying at trial when he denied the existence of an unwritten deal between himself and the State. Further, Nakano explained that

he was coming forward about the off-the-record agreement because
his untruthful testimony had gotten Birano convicted and this
bothered his conscience.[29]

On September 2, 2015, the court denied Birano's
Petition II, finding the State's witnesses--including Breiner,
Wada, and Judge Simms--credible and finding Nakano not

---

[29]     Terry Pennington, a private investigator assisting with Birano's
case, also testified.  Pennington related that he interviewed Breiner, whom
he had worked for in a number of previous cases.  Pennington testified that
Breiner told him there had been an agreement between Nakano and the
prosecutor's office that, in exchange for his truthful testimony, Nakano
would be sentenced under the Youthful Offender Act.  Pennington also
testified that Breiner explained that he and Wada spoke to Nakano after
Nakano invoked the Fifth Amendment and "revisited the agreement with him,
that he was going to have to testify to what they had discussed or [Wada]
wasn't going to ask for him to be sentenced under the Youth Act."  According
to Pennington, Breiner could not recall whether the agreement was in writing
and stated that he did not believe so.

Pennington testified that he also interviewed Wada, who provided
the same information Breiner did: that there was an agreement between the
State and Nakano that Wada would ask for him to be sentenced under the
Youthful Offender Act--eight years versus twenty--if he provided truthful
testimony; that she and Breiner reviewed the agreement with Nakano after he
invoked the Fifth Amendment; and that she could not recall whether the
agreement was in writing but that "it must have been, it would have had to
have been."

Wada and Breiner were interviewed via telephone; the interviews
were not recorded but were summarized by Pennington in written reports, which
also contained the dates of the interviews and the dates of Pennington's
unsuccessful attempts to reach Breiner.

Breiner testified that he did not recall telling Pennington that
a plea agreement had been negotiated in which Nakano would testify for the
State in exchange for a recommendation of youthful offender sentencing.  In
addition, Breiner testified that he did not believe he told Pennington that
he and Wada informed Nakano, after Nakano invoked the Fifth Amendment, that
Nakano would have to testify to be sentenced under the Youthful Offender Act.
Wada, in her testimony, denied telling Pennington that there was an agreement
between the State and Nakano that if Nakano testified the State would
recommend youthful offender sentencing, that Breiner reminded Nakano about
the agreement after Nakano invoked the Fifth Amendment, and that the subject
matter of a plea agreement came up during the in-chambers conference.

credible.[30]  The court also found that "there was no off-the-record plea agreement that induced Nakano's cooperation to testify against [Birano]."  Because there was no plea agreement, the court stated that the prosecution had nothing to disclose to Birano or his trial counsel and no reason to correct Nakano's trial testimony that he did not have a plea agreement with the State.  The court concluded that Petition II was without merit.

Birano filed a notice of appeal to the ICA from the circuit court's order denying Petition II.

## II.    ICA PROCEEDINGS

In his opening brief, Birano asserted that the circuit court erred in denying Petition II.  Birano submitted that the crux of this case was whether there was an off-the-record agreement between Nakano and the State for Nakano to testify against Birano in exchange for a recommendation that Nakano be sentenced as a youthful offender.  Birano first challenged Wada's assertion that she did not need Nakano's testimony to convict Birano, arguing that the court minutes showed otherwise.[31]

---

[30]    The court did not make a credibility finding as to Pennington's testimony.

[31]    The minutes indicate, Birano argued, that the State made continuous efforts to have a codefendant--including both Takara and Nakano--testify against him.  The series of court minutes to which Birano was referring were from proceedings that took place before his trial.  For example, Birano pointed to the minutes of a pretrial conference, which

(continued . . .)

Birano next contended that, while there was no written agreement, the record showed that Nakano relied on the State's promise that he would receive a sentence recommendation of youthful offender if he cooperated by testifying. This reliance, Birano maintained, was supported by the testimony of Breiner, who acknowledged that there was an understanding that if Nakano cooperated, Wada would take it into consideration at Nakano's sentencing. Birano argued that an "understanding" equates to an off-the-record agreement. Birano added that Nakano's reliance on the State's promise was also supported by the testimony of Wada, who stated that Breiner was concerned that Judge Simms would not consider Nakano an appropriate candidate for youthful offender sentencing after Nakano invoked the Fifth Amendment and that Judge Simms had indicated that whether Nakano would be sentenced as a youthful offender would depend on what the State recommended. Birano concluded that the circuit court's findings of fact were clearly erroneous and its conclusions of law were wrong.

In its answering brief, the State submitted that Birano was challenging findings of fact that were based on

---

(. . . continued)

according to Birano "show that the State was trying to work out a plea agreement with Nakano and the State may be willing to go with Youthful Offender sentencing."

determinations of credibility by the trial court and that, pursuant to caselaw, the appellate court's role is not to weigh credibility or resolve conflicting evidence.

In the alternative, the State argued that Birano failed to demonstrate that Nakano's testimony was credible while the testimony of Wada, Breiner, and Judge Simms were not. The State contended that the court minutes do not show that Wada needed Nakano's testimony and the change of plea form does not show the existence of an agreement between the State and Nakano. The State concluded that the circuit court properly denied Petition II as Birano's claim that there was an off-the-record agreement between Nakano and the State lacked merit.

On January 26, 2017, the ICA entered a summary disposition order, affirming the circuit court's order denying Petition II.[32] The ICA concluded that the circuit court's finding that there was no off-the-record agreement between the State and Nakano that led Nakano to testify against Birano was not clearly erroneous and that the court did not err in denying Petition II.

---

[32] The ICA's summary disposition order can be found at Birano v. State, CAAP-15-0000841, 2017 WL 374762 (Haw. App. Jan. 26, 2017).

### III.    STANDARDS OF REVIEW

Findings of fact are reviewed on appeal under the clearly erroneous standard.  Jones v. State, 79 Hawaiʻi 330, 334, 902 P.2d 965, 969 (1995).  "A finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed."  Id. (quoting Tachibana v. State, 79 Hawaiʻi 226, 231, 900 P.2d 1293, 1298 (1995)).  "A finding of fact is also clearly erroneous when the record lacks substantial evidence to support the finding."  O'Grady v. State, 140 Hawaiʻi 36, 43, 398 P.3d 625, 632 (2017) (quoting In re Grievance Arbitration Between State of Haw. Org. of Police Officers, 135 Hawaiʻi 456, 461-62, 353 P.3d 998, 1003-04 (2015)).

"An appellate court may freely review conclusions of law and the applicable standard of review is the right/wrong test."  Dan v. State, 76 Hawaiʻi 423, 428, 879 P.2d 528, 533 (1994) (quoting Maria v. Freitas, 73 Haw. 266, 270, 832 P.2d 259, 262 (1992)).

### IV.    DISCUSSION

A defendant's right to due process is guaranteed by the Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawaiʻi Constitution.  "The due

process guarantee of the . . . Hawaii constitution [] serves to protect the right of an accused in a criminal case to a fundamentally fair trial."[33]  State v. Kaulia, 128 Hawaiʻi 479, 487, 291 P.3d 377, 385 (2013) (alterations in original) (quoting State v. Matafeo, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990)).

Two of the constituent rights encompassed by due process are relevant to this case.  First, under the rule adopted by the U.S. Supreme Court in Brady v. Maryland, 373 U.S. 83, 87 (1963), which "has been incorporated into the Hawaii due process jurisprudence," due process requires that the prosecution disclose "evidence favorable to the accused" that, if suppressed, would deprive the defendant of a fair trial. Matafeo, 71 Haw. at 185-86, 787 P.2d at 672.  Second, "it is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the" constitutional dictates of due process.  Napue v. Illinois, 360 U.S. 264, 269 (1959) (citations omitted).  "The same result obtains when the State, although not soliciting

---

[33]  Though most often framed as a constitutional right of the defendant, the responsibility to provide a fair trial also inheres in the prosecutor's duties as a "minister of justice," which include "specific obligations to see that the accused is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."  American Bar Association Standards for Criminal Justice: Prosecution Function § 3-3.11 cmt. at 97 (3d ed. 1993); see also Brady v. Maryland, 373 U.S. 83, 87 (1963) ("Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.").

false evidence, allows it to go uncorrected when it appears."

Id. (citations omitted).

We consider each right as it applies to this case in turn.

### A.    The Duty to Disclose Favorable Evidence

#### 1.    Constitutional Principles

"[C]entral to the protections of due process is the right to be accorded a meaningful opportunity to present a complete defense."  State v. Tetu, 139 Hawaiʻi 207, 219, 386 P.3d 844, 856 (2016) (quoting Matafeo, 71 Haw. at 185, 787 P.2d at 672).  Under this "well-established principle," "all defendants must be provided with the basic tool[s] of an adequate defense." Id. (alteration in original) (quoting State v. Scott, 131 Hawaiʻi 333, 352, 319 P.3d 252, 271 (2013)).  One such basic tool is access to known favorable evidence on which a defense may be based.  Matafeo, 71 Haw. at 185-86, 787 P.2d at 672.  Therefore, the prosecution has a constitutional obligation to disclose evidence that is material to the guilt or punishment of the defendant.[34]  Id. at 185, 787 P.2d at 672.

---

[34]    This obligation is also set forth in Rule 16 of the HRPP, which provides in relevant part as follows:

> The prosecutor shall disclose to the defendant or the defendant's attorney the following material and information within the prosecutor's possession or control:

(continued . . .)

The duty to disclose evidence that is favorable to the accused includes evidence that may be used to impeach the government's witnesses by showing bias, self-interest, or other factors that might undermine the reliability of the witness's testimony.  Giglio v. United States, 405 U.S. 150, 154 (1972).  "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."  Napue, 360 U.S. at 269.  The U.S. Supreme Court thus "has rejected any . . . distinction between impeachment evidence and exculpatory evidence" in the context of Brady disclosure obligations.  United States v. Bagley, 473 U.S. 667, 676 (1985).

In Giglio v. United States, the seminal case extending Brady to impeachment evidence, the defendant Giglio was convicted of passing forged bank notes based in large part on the testimony of a bank teller who allegedly participated in the

_____

(. . . continued)

            . . .

            (vii) any material or information which tends to
            negate the guilt of the defendant as to the offense
            charged or would tend to reduce the defendant's
            punishment therefor.

HRPP Rule 16(b)(1)(vii) (2012).

scheme.  405 U.S. at 150.  At trial, the bank teller identified Giglio as the originator of the plan and, upon cross-examination, denied that the prosecution had indicated that he might avoid indictment by testifying against Giglio.  Id. at 151-52.

Following Giglio's conviction, Giglio filed a motion for a new trial on the basis of newly discovered evidence, citing an affidavit by an Assistant United States Attorney (AUSA) who had initially secured a grand jury indictment against Giglio.  Id. at 152.  The AUSA averred that he had, in fact, told the bank teller that he would not be indicted if he testified against Giglio.  Id.  In response to Giglio's motion, the Government submitted two affidavits.  The first, from the AUSA who had taken over the case for trial, averred that he had been assured by the first AUSA that no promises of immunity had been made to the bank teller.  Id.  In the second affidavit, the supervising U.S. Attorney averred that he had personally met with the bank teller and his attorney before trial to emphasize that the bank teller "would definitely be prosecuted if he did not testify and that[,] if he did testify[,] he would be obliged to rely on the 'good judgment and conscience of the Government' as to whether he would be prosecuted."  Id. at 152-53.

On review, the U.S. Supreme Court unanimously held that the government's failure to disclose that the bank teller

42

reasonably expected to benefit from his testimony violated due process and justified a new trial.  Id. at 154-55.  The Court determined that the promise made by the first AUSA, regardless of his "authority []or his failure to inform his superiors or his associates," must be attributed to the government.  Id. at 154.  Of the supervising U.S. Attorney's statement to the bank teller that he would simply have to rely on the Government's good judgment and conscience, the Supreme Court stated that this "affidavit, standing alone, contains at least an implication that the Government would reward the cooperation of the witness, and hence tends to confirm rather than refute the existence of some understanding for leniency."  Id. at 153 n.4 (emphases added).  "Evidence of any understanding or agreement" that conveyed a benefit, the Court reasoned, would be relevant to the witness's credibility, "and the jury was entitled to know of it."  Id. at 154.

Thus, although it is true that "[t]he prosecution must reveal the contents of plea agreements with key government witnesses" because such evidence is relevant to impeach the witness by showing bias or interest, California v. Trombetta, 467 U.S. 479, 485 (1984) (citing Giglio, 405 U.S. 150), disclosure obligations are not limited to formal written documents memorializing a quid pro quo between the government and the witness.  Rather, the duty to disclose is triggered,

inter alia, when the government knows or should know that a witness expects to receive some benefit or avoid a detriment by testifying.  The central inquiry is whether the government possesses information that may have a potential negative impact on a key witness's credibility, including that an incentive exists for the witness to deliver testimony that is biased against the defendant.  See Giglio, 405 U.S. at 154-55 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within [the] general rule" that "suppression of material evidence justifies a new trial" (emphasis added) (quoting Napue, 360 U.S. at 269)).  This may often arise from an "agreement or understanding" that the witness may receive a reduction of charges or leniency in sentencing in exchange for testifying as a government witness.[35]  See id. at 152-55.

---

[35]    The duty to disclose is not limited to evidence of promised benefits from the State, and it may be triggered by any admissible evidence affecting witness credibility, including a witness's ulterior motive for testifying, a relevant sensory or mental defect, inconsistent past statements, or previous acts indicating dishonesty.  See, e.g., Milke v. Ryan, 711 F.3d 998, 1001 (9th Cir. 2013) (holding disclosure of witness's "long history of lying under oath and other misconduct" was required); United States v. Kohring, 637 F.3d 895, 907 (9th Cir. 2011) (holding disclosure of evidence that cast doubt upon witness's memory and demonstrated witness had previously suborned perjury was required); see also Stockdale v. Helper, No. 3:17-CV-241, 2017 WL 2546349, at *2 (M.D. Tenn. June 13, 2017) (explaining that, under Giglio, a prosecutor may be unlikely to call as a witness a police officer with a significant disciplinary history "because the prosecutor would be required to disclose to the defense existing information

(continued . . .)

The duty to disclose material impeachment evidence is compelled not only by due process, but also the constitutional right to confrontation.  This court has stated that "[a]n accused's right to demonstrate the bias or motive of prosecution witnesses is protected by the sixth amendment to the United States Constitution, which guarantees an accused, inter alia, the right 'to be confronted with the witnesses against him [or her].'"  State v. Balisbisana, 83 Hawaiʻi 109, 115, 924 P.2d 1215, 1221 (1996) (second alteration in original) (quoting Alford v. United States, 282 U.S. 687 (1931)).  Article I, section 14 of the Hawaiʻi Constitution contains a parallel provision, which we have held "includes a right to appropriate cross-examination."  State v. Calbero, 71 Haw. 115, 124, 785 P.2d 157, 161 (1989).  "It is well-settled that upholding a defendant's rights under the confrontation clause is essential to providing a defendant with a fair trial."  State v. Mattson, 122 Hawaiʻi 312, 325, 226 P.3d 482, 495 (2010).

The right to confrontation "provides the criminal defendant with the opportunity to defend himself [or herself] through our adversary system by prohibiting ex parte trials,

_____

(. . . continued)

about the officer's prior misconduct or other grounds to attack the officer's credibility . . . which could compromise the prosecution").

granting the defendant an opportunity to test the evidence in front of a jury, and guaranteeing the right to face-to-face confrontation." State v. Walsh, 125 Hawai'i 271, 284, 260 P.3d 350, 363 (2011) (alteration in original) (quoting Mattson, 122 Hawai'i at 325, 226 P.3d at 495). In affording the defendant an opportunity to test the evidence, "[t]he right of confrontation affords the accused both the opportunity to challenge the credibility and veracity of the prosecution's witnesses and an occasion for the jury to weigh the demeanor of those witnesses." Batalona v. State, 142 Hawai'i 84, 102, 414 P.3d 136, 154 (2018) (quoting State v. Sua, 92 Hawai'i 61, 70, 987 P.2d 959, 968 (1999)).

"Indeed, the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination[,] . . . [and] the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination." Balisbisana, 83 Hawai'i at 115, 924 P.2d at 1221 (alterations in original) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986)). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." Davis v. Alaska, 415 U.S. 308, 316 (1974). "The partiality of a witness is subject to exploration at trial, and

is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" Id. (quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)).

In light of these constitutional principles, we consider Birano's arguments with regard to the State's disclosure obligations, together with the evidence adduced at the hearing on Petition II.

## 2. Application to Birano's Case

### a. Agreement Regarding a Sentencing Recommendation

On certiorari, Birano contends that there was an off-the-record agreement between the State and Nakano that if Nakano testified against Birano, the State would recommend youthful offender sentencing. In response, the State asserts that Birano's claim that there was such an agreement between the State and Nakano lacks merit.

In denying Petition II, the circuit court found that Breiner, Judge Simms, and Wada were credible while Nakano was not. The court also found that there was no off-the-record plea agreement between the State and Nakano and thus there was nothing for the prosecution to disclose to Birano. There is, however, overwhelming evidence in the record--including in the testimony the court found credible--demonstrating that the State possessed material information relevant to Nakano's credibility that was required to be disclosed.

47

First, the hearing testimony strongly contradicted the circuit court's conclusion that no agreement existed between Nakano and the State. Judge Simms's testimony expressly referenced the existence of an agreement in which Nakano would receive a benefit for his testimony. Judge Simms stated repeatedly that, while she was not a party to some of the exchanges between Breiner and Wada following Nakano's invocation of the Fifth Amendment, Judge Simms understood that Breiner and Wada discussed an agreement in which Nakano would testify in exchange for a favorable recommendation from the State at sentencing. Specifically, Judge Simms confirmed upon questioning that it was "fair to say" that there was a discussion between Breiner and Wada about an agreement involving Nakano. And she agreed that "the gist" of the arrangement discussed "was that if he, Nakano, testified against Mr. Birano, the State would recommend the Youthful Offender Act."

Even the testimony of Breiner, who ostensibly denied the existence of an agreement, actually indicated that some arrangement existed in which Nakano's testimony at Birano's trial would be beneficial to Nakano. Breiner testified that there was an "understanding" that if Nakano testified against Birano, Wada would "take it into consideration" with respect to her sentencing recommendation. Breiner attempted to distinguish this understanding from an agreement, noting that Wada had

indicated she did not have the authority to enter into a formal arrangement on the subject:

> There was no agreement at all. <u>There was an understanding that if he cooperated, then the court -- then the prosecutor, Ms. Wada, would take it into consideration</u> and recommend, we were hoping, youth offender treatment. She couldn't get approval for it. She couldn't say that she had authority to do that and there was nothing in writing.

(Emphases added.) There are further statements in Breiner's testimony that suggest he considered any arrangement in which a prosecutor makes a non-binding recommendation at sentencing in exchange for testimony to be an "understanding" rather than a deal or agreement:

> Q. Okay. And sometimes those are deals where the State's going to make a recommendation for your client at sentencing but the judge is not bound by that recommendation, correct?
>
> A. <u>You're using the word "deal." There's an understanding. If that's what you mean by deal, that's a little different. There's an understanding sometimes the prosecutor will make a recommendation.</u>

(Emphasis added.)

The purported distinction between an agreement and an understanding is spurious under the law, and it is irrelevant for purposes of the State's constitutional disclosure obligations. "Agreement" is defined as "[a] mutual <u>understanding</u> between two or more persons about their relative rights and duties regarding past and future performances." <u>Agreement</u>, <u>Black's Law Dictionary</u> (10th ed. 2014) (emphasis added). Conversely, an "understanding" is "<u>[a]n agreement</u>, esp. of an implied or tacit nature." <u>Understanding</u>, <u>Black's Law</u>

Dictionary (10th ed. 2014) (emphasis added). The terms are legally equivalent in this context, as demonstrated by the lack of differentiation in the Supreme Court's analysis in Giglio. See 405 U.S. at 154-55 (holding that "evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it" (emphasis added)).

Thus, when Breiner used "understanding" to refer to an unwritten, informal arrangement between Nakano and the State in which Nakano would receive a youthful offender recommendation in exchange for his testimony, the arrangement still amounted to an agreement that was required to be disclosed.[36] "[T]he Supreme Court has never limited a Brady violation to cases where the facts demonstrate that the state and the witness have reached a bona fide . . . deal." LaCaze v. Warden La. Corr. Inst. for Women, 645 F.3d 728, 735 (5th Cir. 2011); accord United States v. Bagley, 473 U.S. 667, 683 (1985) (holding disclosure is required despite the witness's "stake" not being "guaranteed through a promise or binding contract"). Given this evidentiary

---

[36]    Wada's lack of authority and inability to obtain approval to enter into an agreement were similarly immaterial to her disclosure obligations. See Giglio, 405 U.S. at 154 ("In the circumstances shown by this record, neither [the AUSA]'s authority nor his failure to inform his superiors or his associates is controlling. . . . The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government.").

record, we are "left with the definite and firm conviction" that the circuit court was mistaken in its finding that no agreement existed. Jones v. State, 79 Hawai'i 330, 334, 902 P.2d 965, 969 (1995) (quoting Tachibana v. State, 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995)). Accordingly, this finding was clearly erroneous.

Even had the circuit court's finding that no agreement existed between Nakano or his counsel and Wada not been clearly erroneous, however, it would not be the end of our inquiry into the State's disclosure obligations. When determining whether the disclosure of impeachment evidence is required, the relevant question "is not whether the prosecutor and the witness entered into an effective agreement, but whether the witness 'might have believed that the [S]tate was in a position to implement any promise of consideration.'" LaCaze, 645 F.3d at 735 (alterations omitted) (quoting Napue, 360 U.S. at 270). The "possibility of a reward" gives a witness "a direct, personal stake in [the defendant]'s conviction." Bagley, 473 U.S. at 683 (emphasis added). Thus, an indication by the State sufficient to make Nakano believe his testimony might be rewarded was sufficient to trigger Wada's disclosure obligations, regardless of whether an agreement existed.

This is to say that an indication that the State would simply take Nakano's assistance "into consideration"--which

Breiner testified was part of the "understanding"--was required to be disclosed even if it was not accompanied by a promise of the exact reward.  In Giglio v. United States, the supervising U.S. Attorney made a similarly noncommittal statement regarding the advantages of cooperation, telling the witness "that if he did testify he would be obliged to rely on the" Government's "good judgment and conscience" as to whether he would be prosecuted.  405 U.S. 150, 153 n.4 (1972).  The U.S. Supreme Court concluded that the statement nonetheless carried an implication that the witness would receive a benefit from the Government in exchange for his cooperation and thus "tend[ed] to confirm rather than refute the existence of some understanding for leniency."  Id. (emphasis added).  Subsequent cases have confirmed that an implication of consideration is sufficient to trigger disclosure and that "[a] promise is unnecessary." Tassin v. Cain, 517 F.3d 770, 778 (5th Cir. 2008).

Indeed, when a witness's stake in the outcome of the case is "not guaranteed through a promise or binding contract," but is instead "contingent on the Government's satisfaction with the end result," it "serves only to strengthen any incentive to testify falsely in order to secure a conviction."  Bagley, 473 U.S. at 683 (emphasis added).  This is because, when the State conveys only that it will take a witness's testimony into account in determining whether to grant the witness favorable

treatment, it provides a motivation for the witness to testify so as to curry as much favor with the State as possible. The witness is then more likely to prioritize the State's satisfaction over testifying truthfully, making this incentive structure highly relevant to the witness's credibility. The jury is therefore "entitled to know of it" in order to properly assess the veracity of the witness's testimony. Giglio, 405 U.S. at 154.

Thus, considered together, the testimony at the Petition II hearing that was found to be credible strongly evidenced that Nakano's testimony at Birano's trial was motivated by the possibility of a reward from the State. Notwithstanding any express denials of an agreement, Breiner's testimony that there was an "understanding" that the State would provide a youthful offender recommendation if Nakano were to testify, viewed in light of and in conjunction with Judge Simms's testimony expressly stating that such an arrangement existed, clearly indicated that an actual agreement existed between Nakano and the State.[37] The circuit court therefore

---

[37] It is noted that the progression of events is consistent with the existence of such an agreement between Nakano and the State. Nakano was indicted and pleaded no contest to charges of robbery in the first degree, kidnapping, and burglary in the first degree. Although Wada later testified that she believed Nakano was "peripheral," "barely involved in the incident," and simply a "young kid" who "was in the wrong place at the wrong time," she filed a motion seeking extended terms of imprisonment against Nakano, including a life sentence for the kidnapping and robbery charges. No similar

(continued . . .)

clearly erred in its factual findings to the contrary. See

Jones, 79 Hawai'i at 334, 902 P.2d at 969 ("A finding of fact is

clearly erroneous when, despite evidence to support the finding,

the appellate court is left with the definite and firm

conviction in reviewing the entire evidence that a mistake has

been committed." (quoting Tachibana, 79 Hawai'i at 231, 900 P.2d

at 1298)). Yet disclosure would have been required even if such

an agreement did not exist because an indication that a

witness's testimony will be taken into account is also strongly

probative of the witness's credibility, and the jury is entitled

to know of it. Bagley, 473 U.S. at 683. The testimony adduced

at the hearing on Petition II indisputably indicated that such a

representation was made to Nakano or his counsel.

The arrangement between Wada and Breiner was crucial

evidence relevant to Nakano's credibility because it provided an

incentive for him to "slant" his testimony against Birano.

State v. Levell, 128 Hawai'i 34, 40, 282 P.3d 576, 582 (2012)

---

(. . . continued)

motion was filed against Takara, who was also eligible for an extended term but whom the State did not later call as a witness at Birano's trial. Prior to Birano's trial, Nakano and Breiner met with Wada at the prosecutor's office. Nakano thereafter appeared at Birano's trial and, following the unrecorded in-chambers meeting, declined to assert his Fifth Amendment privilege and testified for the State. Wada then stated at Nakano's sentencing hearing that he had provided "tremendous assistance" by testifying against Birano, withdrew the motion for extended terms of imprisonment, and recommended that Nakano instead be sentenced as a youthful offender.

(quoting Addison M. Bowman, Hawaii Rules of Evidence Manual §

609.1-[1][C] (2010-11 ed.)).  Had the arrangement been

disclosed, Birano would have been afforded the opportunity to

explore this motivation and challenge the veracity of Nakano's

testimony.[38]  State v. Tetu, 139 Hawaiʻi 207, 219, 386 P.3d 844,

856 (2016).  In the absence of this evidence, the jury did not

have "sufficient information from which to make an informed

appraisal" of Nakano's credibility.  Levell, 128 Hawaiʻi at 40,

282 P.3d at 582; accord State v. Acacio, 140 Hawaiʻi 92, 100-01,

398 P.3d 681, 689-90 (2017) (concluding that the defendant's

right to confrontation was violated when he was prevented from

cross-examining a witness about evidence tending to show motive

or bias).  The State was thus required under due process and the

Confrontation Clause to disclose this arrangement.  Tetu, 139

---

[38]     It is of no consequence whether this arrangement existed at the time of Nakano's plea.  Under HRPP Rule 16(e)(2) (2012),

> If subsequent to compliance with these rules or orders
> entered pursuant to these rules, a party discovers
> additional material or information which would have been
> subject to disclosure pursuant to this Rule 16, he shall
> promptly notify the other party or his counsel of the
> existence of such additional material or information, and
> if the additional material or information is discovered
> during trial, the court shall also be notified.

Thus, "HRPP Rule 16(e)(2) places a continuing duty to disclose on the parties."  State v. Moriwaki, 71 Haw. 347, 354-55, 791 P.2d 392, 396 (1990).  Moreover, an arrangement arising at any time prior to Nakano's testimony was highly relevant to his credibility, and thus disclosure is required under constitutional due process.

Hawaiʻi at 219, 386 P.3d at 856; <u>California v. Trombetta</u>, 467 U.S. 479, 485 (1984) (citing <u>Giglio</u>, 405 U.S. 150); 21A Am. Jur. 2d <u>Criminal Law</u> § 1171 (2018); <u>State v. Baron</u>, 80 Hawaiʻi 107, 117, 905 P.2d 613, 623 (1995). And the circuit court erred as a matter of law in determining that no disclosure was required.

### b. The Court's Sentencing Inclination

The uncontroverted evidence in the record also demonstrates that the circuit court made representations regarding its inclination to follow the State's recommendation at Nakano's sentencing. Wada testified that, during the in-chambers meeting between herself, Judge Simms, and Breiner, Breiner asked Judge Simms whether Nakano's refusal to testify would preclude him from receiving the benefit of the Youthful Offender Act at sentencing. In response, Wada testified, Judge Simms stated, "Well, it's going to depend on what the State asks. If the State asks for it, then I'm inclined to follow it." Later in her testimony, Wada reiterated that Judge Simms had indicated that she would defer to the State in determining Nakano's sentence when Judge Simms stated, "Well, I don't know. It depends on what the State asks."[39]

---

[39] The dissent questions the reliability of this testimony, characterizing it as "indirect evidence" of Judge Simms's statements that is "arguably hearsay-within-hearsay." Dissent at 15-16 n.2. As an initial matter, Judge Simms's words would not themselves be barred by the rule against hearsay because, as statements of intention, they reflect her then-

(continued . . .)

This court considered the role of a court's expressed sentencing inclination in State v. Sanney, 141 Hawai'i 14, 404 P.3d 280 (2017). Analogizing a sentencing inclination to a plea agreement, we recognized that such a suggestion from the court is a powerful motivating force in inducing a defendant to plead guilty or no contest, and we held that a court therefore must allow a defendant an opportunity to withdraw a plea if the court elects not to follow a previously expressed sentencing inclination. Id. at 22-23, 404 P.3d at 288-89.

A court's expression of a conditional sentencing inclination brings a similar inducement to bear on a prospective witness. In Tassin v. Cain, for instance, the U.S. Court of Appeals for the Fifth Circuit considered a trial court's statement to a wife codefendant in a capital murder case that the court was inclined to sentence her to twenty to thirty

---

(. . . continued)

existing mental condition and are admissible pursuant to Hawaii Rules of Evidence Rule 803(b)(3) (2002). See State v. Robinson, 79 Hawai'i 468, 470, 903 P.2d 1289, 1291 (1995). Thus, Wada's direct testimony based on personal knowledge of Judge Simms's expressed sentencing inclination was clearly admissible under the state of mind hearsay exception. And, while Wada also testified to Judge Simms's sentencing inclination statements in the context of recounting information she had previously related to Pennington, the duplicative nature of this testimony renders it unnecessary to consider whether it would be barred by the rule against hearsay.

Furthermore, neither recounting of Judge Simms's statements by Wada garnered an objection from the State. And the State did not question Wada's testimony upon redirect or introduce any contrary evidence on the matter. Wada's testimony on this point is therefore uncontroverted.

years. 517 F.3d 770, 774 (5th Cir. 2008). The trial court indicated, however, that it would consider reducing the wife's sentence to fifteen years if she waived the marital privilege to testify against her husband and to ten years if her testimony was consistent with her previous statement to police. Id. The Fifth Circuit held that it was immaterial that the court's statement of inclination did not amount to a "promise"; the State was constitutionally required to reveal the arrangement to the defendant and the jury. Id. at 779.

When, as here, a court states that it is inclined to make its sentencing contingent on a prosecutor's recommendation, the inclination is no less a motivating force in inducing a witness's favorable testimony than the tiered sentencing inclination given in Tassin.[40] Nakano knew that, if the State was satisfied with his testimony and recommended a more lenient sentence under the Youthful Offender Act, he was virtually certain to receive that sentence based on the court's stated inclination. Conversely, Nakano knew that, if the State was not satisfied with his testimony or his decision not to testify, he

---

[40] This court also held in Sanney that a trial court should not use a sentencing inclination as a tool to bargain with a defendant. 141 Hawai'i at 21, 404 P.3d at 287. Additionally, the "imposition of a sentence . . . is a core judicial function" that "cannot be delegated to nonjudicial officers." United States v. Johnson, 48 F.3d 806, 808-09 (4th Cir. 1995) (citing Ex Parte United States, 242 U.S. 27, 41 (1916)). Thus, it would appear to be improper for a court to express an inclination to follow whatever sentence the prosecution recommends.

was very likely to be sentenced as an adult offender and receive at least a twenty-year prison term. Indeed, the court's stated inclination to follow the State's recommendation may have suggested to Nakano that the court would grant the State's pending motion for extended term sentencing if the motion was not withdrawn, giving Nakano the impression that he would be subject to life imprisonment if he did not testify to the State's satisfaction.

The coercive effect of this carrot-and-stick arrangement should not be understated. By expressing its inclination to follow the prosecution's sentencing recommendation, the circuit court elevated and reinforced the unwritten bargain between Nakano and the State, granting it a status somewhat akin to a HRPP Rule 11(f)(1) plea agreement in which the court has agreed to be bound.[41] Further still, the court's inclination suggested a harsh forfeit not generally

---

[41] HRPP Rule 11(f)(1) provides as follows:

(f) Plea agreement.

(1) In general. The prosecutor and counsel for the defendant, or the defendant when acting pro se, may enter into plea agreements that, upon the entering of a plea of guilty or no contest to a charged offense or to an included or related offense, the prosecutor will take certain actions or adopt certain positions, including the dismissal of other charges and the recommending or not opposing of specific sentences or dispositions on the charge to which a plea was entered. The court may participate in discussions leading to such plea agreements and may agree to be bound thereby.

present in a binding plea agreement--the certain imposition of the indeterminate twenty-year prison term and the real possibility of an extended term sentence if Nakano did not cooperate and testify to the State's satisfaction.  Under the circumstances, Nakano possessed a compelling incentive not only to testify against Birano but also to testify so as to curry favor with the State.

In light of the circuit court's sentencing inclination, which informed Nakano that the determination of his eventual sentence had essentially been delegated to the State, Nakano may have "consciously or unconsciously . . . slant[ed]" or biased his testimony to complement the State's theory of the case.  State v. Levell, 128 Hawai'i 34, 40, 282 P.3d 576, 582 (2012).  "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'"  Davis v. Alaska, 415 U.S. 308, 316 (1974) (quoting 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970)).  The jury was thus "entitled to know of" the court's sentencing inclination, and disclosure was required prior to Nakano testifying.  Giglio v. United States, 405 U.S. 150, 155 (1972).  The State plainly failed to fulfill this constitutional obligation.  The circuit court therefore clearly erred as a matter of fact and law in concluding that

there was no impeachment evidence that was required to be disclosed to Birano.

### B.    The Duty to Correct False Testimony

Although not necessary to our decision today, we note that "[t]he most rudimentary of the access-to-evidence cases impose upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath." California v. Trombetta, 467 U.S. 479, 485 (1984). This principle "does not cease to apply merely because the false testimony goes only to the credibility of the witness." Napue, 360 U.S. at 269. Further, the good faith of the prosecutor in failing to correct false testimony regarding impeachment material has no bearing on whether a defendant received a fair trial as required by due process:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he [or she] knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

Id. at 269-70 (emphases added) (quoting People v. Savvides, 1 N.Y.2d 554, 557 (1956)). Thus, when the State's witness denies the presence of an ulterior motive or other evidence bearing negatively on the witness's credibility and the State is aware

the denial is false, the prosecution has a constitutional duty to correct the false testimony, and the failure to do so violates due process irrespective of the prosecutor's intent.

In denying Petition II, the circuit court found that because there was no off-the-record plea agreement between the State and Nakano, there was no need for the prosecution to correct Nakano's testimony at trial.  As discussed supra, the arrangement between Nakano and the State was required to be disclosed even if it did not constitute a formal agreement.  But even in the absence of an arrangement, it would not obviate the prosecution's duty to correct Nakano's testimony.

"[T]he crux" of a due process violation arising from a prosecutor's failure to correct false testimony is the "deception" of the finder of fact and not whether any deal for leniency actually existed.  Tassin v. Cain, 517 F.3d 770, 778 (5th Cir. 2008).  "A promise is unnecessary."  Id.  The proper focus of such an inquiry is therefore "the extent to which the testimony misled the jury, not whether the promise was indeed a promise."  LaCaze v. Warden La. Corr. Inst. for Women, 645 F.3d 728, 735 (5th Cir. 2011) (quoting Tassin, 517 F.3d at 778).

At Birano's trial, Nakano testified not only that he had no plea arrangement with the State, but also that he was testifying simply "[t]o tell the truth."  Nakano indicated that he had not pleaded no contest so that he "could get off easier."

He denied that he "wanted to do well" in testifying in front of the judge and prosecution and insisted he was not hoping that by testifying favorably for the State he would obtain a more lenient sentence. And although Nakano admitted when pressed on cross-examination that he had initially asked the court for youthful offender sentencing and was still hoping to obtain it, he strongly indicated that the possibility that his testimony would be accounted for in that determination played no part in his decision to testify.

The credible testimony at the hearing on Petition II indicated that these statements were very likely to mislead the jury regarding material facts. As discussed supra, Breiner testified that an "understanding" existed between him and Wada in which Nakano's testimony would be taken "into consideration" with respect to the State's sentencing recommendation, and Judge Simms repeatedly stated that it was her understanding that an actual quid-pro-quo agreement existed. Nakano's testimony at Birano's trial that no agreement existed was therefore very likely to give the jury an inaccurate understanding of material facts. Further, even the testimony of Wada, who denied the existence of an agreement, indicated that portions of Nakano's testimony were highly misleading because he was in fact motivated by a desire to obtain a lighter sentence under the

Youthful Offender Act--and not simply a moral obligation "to tell the truth."

Wada testified that, prior to trial, Breiner "kept asking [her] for a deal." She stated that Breiner had "basically told [her] his client had no case, he confessed and he implicated everybody, and the only chance he ha[d] is a Youthful Offender sentencing." Wada testified that, during the off-the-record meeting in chambers, Breiner told Judge Simms in her presence that Nakano was afraid to testify against Birano but he was concerned that Nakano would not be considered a candidate for youthful offender sentencing if he did not do so. Breiner then inquired whether Judge Simms would still consider a youthful offender sentence if Nakano changed his mind and elected to testify despite his fear of Birano. Wada stated that she was included in this conversation, that Judge Simms asked her whether the State would be recommending a youthful offender sentence after indicating the court would defer to her judgment, and that she responded by saying she did not know yet because they did not have a plea agreement and Nakano had not yet testified for her.

On this record, a prosecutor would have good reason to be aware that Nakano's purported fear of Birano was overcome by his desire to obtain a youthful offender sentence and avoid the extended life term the State had requested. Consequently, a

prosecutor would have reason to know that Nakano's claims that he was testifying to tell the truth and that he was not hoping his testimony would earn him a more lenient sentence were likely to mislead the jury. Similarly, there was ample reason to surmise that Nakano's assertion that he had no desire to "do well" in front of the judge and prosecution was likely untrue-- particularly in light of Judge Simms's stated inclination to follow the State's recommendation at sentencing.

Although the jury was informed that Nakano could receive an extended term sentence that included life imprisonment, it had no knowledge that the State had a pending motion requesting such an extended term or that the court had indicated it was inclined to follow the prosecution's recommendation. Under the circumstances, Nakano's testimony that he was not expecting or hoping for any sentencing benefit in exchange for his testimony was deceptive and gave the jury a highly inaccurate impression as to Nakano's "personal stake" in Birano's conviction. United States v. Bagley, 473 U.S. 667, 683 (1985).

Because we hold that the State's failure to disclose information material to Nakano's credibility warrants a new trial, we need not decide whether the failure to correct Nakano's testimony would justify setting aside Birano's convictions in its own right. We note, however, that a

prosecutor's constitutional duty to correct testimony is triggered even when a witness's testimony is "at best misleading." United States v. Dvorin, 817 F.3d 438, 452 (5th Cir.), cert. denied, 137 S. Ct. 140 (2016). Prosecutors should therefore err on the side of caution in future cases when faced with testimony of a government witness that they know may mislead the jury as to some material fact.

### C.     The Errors Were Material and Not Harmless

"Violation of the constitutional right to confront adverse witnesses is subject to the harmless beyond a reasonable doubt standard." State v. Balisbisana, 83 Hawai'i 109, 113-14, 924 P.2d 1215, 1219-20 (1996) (citing State v. Corella, 79 Hawai'i 255, 261, 900 P.2d 1322, 1328 (App. 1995)). Additionally, the failure of the prosecution to disclose impeachment evidence warrants a new trial if the evidence is "material."[42] State v. Arnold, 66 Haw. 175, 179, 657 P.2d 1052, 1054 (1983) (citing Giglio v. United States, 405 U.S. 150, 154 (1972); Napue, 360 U.S. at 264). When the "reliability of a given witness may well be determinative of guilt or innocence,"

---

[42]     Because materiality represents a higher standard than harmless beyond a reasonable doubt, facts establishing materiality will necessarily establish a harmful error. See Kyles v. Whitley, 514 U.S. 419, 435-36 (1995) ("[O]nce a reviewing court . . . has found constitutional error [from nondisclosure], there is no need for further harmless-error review."). We therefore analyze the issues together.

the nondisclosure of evidence affecting that witness's credibility is material.  Giglio, 405 U.S. at 154 (quoting Napue, 360 U.S. at 269).  Put another way, evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  State v. Moriwaki, 71 Haw. 347, 356, 791 P.2d 392, 397 (1990) (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Thus, the nondisclosure of impeachment evidence bearing on Nakano's credibility warrants granting Birano a new trial if Nakano's testimony was material in the obtainment of Birano's convictions.

To convict Birano of the robbery offense with which he was charged, the State was required to prove beyond a reasonable doubt that Birano "threaten[ed] the imminent use of force against" Dumlao "with intent to compel acquiescence to the taking of or escaping with the property."  See HRS § 708-840(1)(b)(ii).  Therefore, the State was required to prove that Birano intended to take property from Dumlao through the threat of force in order to convict Birano of robbery.

Birano's burglary conviction, on the other hand, could be sustained only if the State proved beyond a reasonable doubt that Birano entered or remained in Dumlao's apartment intending to commit a crime against persons or property.  See HRS § 708-810(1).  Although a claim of right is not an available defense

to robbery through the threat of force, State v. McMillen, 83 Hawaiʻi 264, 265, 925 P.2d 1088, 1089 (1996), such a defense is available to theft--the crime the State argued Birano intended to commit when he entered Dumlao's apartment, see HRS § 708-34 (2014).  Thus, in order to convict Birano of burglary, the State was required to prove that Birano entered or remained in Dumlao's apartment while intending to either take property from Dumlao through the threat of force or take property to which he had no claim of right.  Additionally, the indictment against Birano stated that one of the firearm offenses with which Birano was charged--carrying, using, or threatening to use a firearm in the commission of a separate felony--was based on Birano's carrying of a firearm during the commission of the burglary offense.  This charge was therefore dependent on the State proving that the burglary occurred, and Birano could not be convicted for this firearm offense if he was not also convicted of the burglary.[43]

Birano testified that, two days prior to the incident at Dumlao's apartment, Dumlao stole $2,500 from him in a

---

[43]    Birano did not dispute that he was in possession of the illegal firearm that formed the basis of the other charged firearm-related offenses, and the disclosure failures are thus harmless beyond a reasonable doubt with respect to those convictions.  Additionally, the jury acquitted Birano of the kidnapping charge, and we therefore need not consider the effect of the nondisclosures in regard to this offense.

fraudulent drug transaction. Birano stated that he, Nakano, and Takara went to Dumlao's apartment on the day of the incident to get back his property. Although Birano acknowledged that he had a gun with him at the time, Birano testified that he carried it only for self-defense because he had previously been kidnapped and held at gunpoint and he did not know if Dumlao was armed. Birano further testified that he did not point the gun at Dumlao and that he put the gun away when he saw that Dumlao did not himself have a gun. Birano stated that, upon being confronted about the unfulfilled drug transaction, Dumlao voluntarily invited Takara, Nakano, and him up to the apartment to retrieve Birano's property. Birano testified that he did not intend to terrorize Dumlao, that he never threatened Dumlao with the gun, and that he drew the gun again only when Dumlao refused to enter after opening the door to the apartment because Birano feared someone was waiting inside as part of a "setup." And Birano stated that he did not take anything from the apartment after Dumlao ran to the balcony and exited down the side of the building.

If the jury credited Birano's testimony, it would not have convicted Birano of the robbery and burglary offenses because he did not have the requisite intent to take property from Dumlao or from his apartment through the threat of force, nor did he enter or remain in Dumlao's apartment intending to

take property to which he had no claim of right. The State's case against Birano with respect to these charges therefore turned on whether it offered evidence disproving Birano's claim that he intended only to get his property back and neither threatened Dumlao with the gun nor intended to do so.

Birano's account was corroborated by Poomaihealani, who testified that Dumlao had told him that he had taken $2,000 from Birano in a fraudulent drug transaction and had falsely claimed Birano had robbed him to divert police attention from this exchange. Birano's testimony was also consistent with the surveillance video, which showed Dumlao walking casually up the stairs and did not show a gun in Birano's hands until just before he entered the apartment. It was consistent with the testimony of Dumlao's neighbors Kobayashi and Cruz, who both stated that, when they opened their doors to check on the disturbance they had heard, they did not see a gun and Dumlao assured them everything was alright. And it was in accord with the investigating police officer's testimony that numerous valuables were in Dumlao's apartment during the incident, yet nothing appeared to have been taken. The State's case was therefore entirely dependent on the jury crediting the testimony of the three witnesses who claimed Birano had threatened Dumlao with the gun and demanded that he open his safe so that Birano

could take property to which he had no claim of entitlement: Casil, Nakano, and Dumlao himself.

There is ample evidence in the record from which a reasonable juror could doubt the veracity of Casil's and Dumlao's accounts. As stated, Birano's and Poomaihealani's testimonies suggested that Dumlao was a drug dealer and that he had stolen money from Birano through a sham drug transaction and was attempting to implicate Birano to allay suspicion. In addition to Casil's romantic relationship with Dumlao, she testified that she was a crystal meth user and that Dumlao had given her meth on previous occasions, which granted her multiple incentives to back up Dumlao's version of events. Casil also testified that she could not recall whether she had used crystal methamphetamine on the morning of the incident, that she could not confirm at which part of Dumlao's body Birano pointed the gun, and that she ran away almost immediately when the incident began.

Nakano, a confederate of Birano in the most serious of the charged offenses who from the jury's point of view had nothing to gain by lying, provided compelling testimony describing a key aspect of the State's case against Birano--that Birano had threatened Dumlao with a gun for the purpose of taking property from him. Nakano's credibility was therefore an integral part of Birano's convictions on the robbery and

burglary offenses.  Indeed, Nakano's status as a codefendant allegedly testifying out of a moral obligation to tell the truth likely lent particular weight to his testimony, cementing the crucial details the State was required to prove in the mind of the jury.  Wada herself described the assistance Nakano rendered to the State as "tremendous" during Nakano's sentencing hearing.

By failing to disclose that Nakano possessed a significant incentive to curry favor with the State and was thus not actually disinterested in the outcome of the case, the State withheld highly relevant evidence to which the jury was entitled and thereby deprived Birano of a fair trial.  The error was therefore material and not harmless beyond a reasonable doubt, and neither Birano's robbery and burglary convictions nor the related carrying of a firearm conviction may stand.[44]

## V.    CONCLUSION

Based on the foregoing, the ICA's March 10, 2017 Judgment on Appeal and the circuit court's September 2, 2015 Order Denying Petition To Vacate, Set Aside, Or Correct Judgment Or To Release Petitioner From Custody, Filed On September 9, 2009 are vacated.  The circuit court's February 18, 2003

---

[44]    Although the State's nondisclosure is harmless beyond a reasonable doubt with respect to Birano's four other convictions involving his possession of firearm, see supra note 43, Birano's convictions that are herein vacated were an integral part of the sentencing of Birano to indeterminate and extended terms for the firearm possession convictions. Birano's sentences for these firearm offenses must therefore be vacated with resentencing to occur following disposition of the vacated convictions

Judgment of Guilty Conviction and Sentence is vacated with respect to Birano's convictions for violations of HRS § 134-6(a) and (e), HRS § 708-840(1)(b)(ii), and HRS § 708-810(1)(c). Birano's sentences for his convictions for violations of HRS § 134-8(a) and HRS § 134-7(b) and (h) are also vacated, with resentencing to occur following disposition of the vacated convictions, and the case is remanded to the circuit court for further proceedings consistent with this opinion.

Keith S. Shigetomi  
for petitioner

Stephen K. Tsushima  
for respondent

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

