**Electronically Filed
Supreme Court
SCWC-17-0000078
15-JUN-2020
08:38 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

_____

STATE OF HAWAIʻI, Respondent/Plaintiff-Appellee,

vs.

KENTARU KRISTOPHER STONE, also known as KENTARO K. STONE,
Petitioner/Defendant-Appellant

SCWC-17-0000078

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000078; 1PC161000543)

JUNE 15, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This appeal arises from a jury trial in the First Circuit of the Circuit Court ("circuit court")[1] in which Kentaru Kristopher Stone ("Stone") was convicted by a jury on the charge of promoting a dangerous drug in the third degree.

---

[1]    The Honorable Jeffrey P. Crabtree presided.

At around 3:45 a.m. on April 5, 2016, Stone was approached at Ala Moana Beach Park by Honolulu Police Department ("HPD") Officer Douglas Korenic II ("Officer Korenic"). Stone was seated on a picnic table with various items strewn around him, including one or more identification cards ("IDs"). Based on discovery provided by the State of Hawai'i ("State"), Officer Korenic's testimony was anticipated to be that he approached Stone for a park closure or rules violation, that Stone would not provide information regarding his identity, and that Stone then threw a small "baggie" containing methamphetamine, which landed on the picnic table.

Based on provided discovery, defense counsel's theory of the case during opening statement was that, because the only found property report related to an iPhone, the other items on the picnic table shown in photographs belonged to Stone and included Stone's ID. Defense counsel theorized that Officer Korenic's testimony that he had been unable to ascertain Stone's identity would therefore be untruthful. The defense theory was also that Officer Korenic had searched Stone's bag and had strewn Stone's belongings all over the table, as shown in the photographic exhibits; that Officer Korenic must have planted the methamphetamine baggie after rifling through Stone's bag or that the methamphetamine baggie was already there but did not belong to Stone; and that Officer Korenic did not seek a search

warrant for the bag because, based on his search, he already knew there was no drug paraphernalia therein.

During trial, however, Officer Korenic, who was the only witness to Stone's alleged methamphetamine possession, testified in cross-examination that in addition to the found property report regarding the iPhone, he had generated additional found property reports as to the other miscellaneous items on the picnic table, including other people's IDs. He also testified the IDs and other items on the picnic table did not belong to Stone.

The circuit court therefore called a mid-trial recess. The State procured and the defense reviewed additional police reports referenced in Officer Korenic's incident report that had not been produced in discovery. The additional reports referenced in the incident report were, however, completely unrelated to Stone's case. Yet, in his resumed testimony, Officer Korenic persisted in his testimony that additional found property reports existed pertaining to Stone's case.

The jury found Stone guilty of promoting a dangerous drug in the third degree.

Stone moved for a new trial pursuant to Hawai'i Rules of Penal Procedure ("HRPP") Rule 33 (2012),[2] arguing he was deprived

---

[2]    HRPP Rule 33 states in relevant part: "A motion for a new trial shall be made within 10 days after verdict or finding of guilty or within such
(continued. . .)

of a fair trial because he had expected no dispute that the ID on the picnic table belonged to him.  This was because discovery had not indicated items other than the iPhone belonged to others.  On December 27, 2016, the circuit court denied Stone's motion for new trial, sentenced Stone to a five-year term of imprisonment, and entered its judgment on January 18, 2017.

Stone appealed to the Intermediate Court of Appeals ("ICA"), arguing that the circuit court erred in denying his motion for new trial.  He asserted he met this court's four-part test for a new trial based on newly discovered evidence.  See State v. McNulty, 60 Haw. 259, 588 P.2d 438 (1978), overruled on other grounds by Raines v. State, 79 Hawai'i 219, 900 P.2d 1286 (1995).[3]  He also asserted he met the ICA's four-part test for a new trial based on false testimony from a material prosecution witness.  See State v. Teves, 5 Haw. App. 90, 679 P.2d 136

_____

(. . .continued)
further time as the court may fix during the 10-day period.  The finding of guilty may be entered in writing or orally on the record."

[3]     In McNulty, in relevant part, this court established a four-part test for granting motions for new trial based on newly discovered evidence:

> A motion for new trial based on newly discovered evidence
> will be granted only if all of the following requirements
> have been satisfied: (1) the evidence has been discovered
> after trial; (2) such evidence could not have been
> discovered before or at trial through the exercise of due
> diligence; (3) the evidence is material to the issues and
> not cumulative or offered solely for purposes of
> impeachment; and (4) the evidence is of such a nature as
> would probably change the result of a later trial.

60 Haw. at 267-68, 588 P.2d at 445.

(1984).[4]  Stone also argued his right to a fair trial was violated.

In its November 27, 2019 summary disposition order, the ICA rejected Stone's arguments, ruling the circuit court did not abuse its discretion in denying the motion for new trial because Stone failed to satisfy the McNulty and Teves tests.  See State v. Stone, CAAP-17-0000078, 2019 WL 6359162 (App. Nov. 27, 2019) (SDO).  The ICA did not address this court's opinion in Birano v. State, 143 Hawai'i 163, 182, 426 P.3d 387, 406 (2018), which was issued after Stone's 2017 reply brief, but before its SDO.

We hold the ICA erred in affirming the circuit court's denial of the motion for new trial because Stone satisfied the Teves test.  Because the Teves test governs the circumstances of this case, we need not and do not address whether Stone satisfied the McNulty test.

We also hold Stone's right to a fair trial was violated because, as the ICA correctly noted, Officer Korenic testified

---

[4]    In Teves, the ICA set out a four-part test for granting a new trial based on a prosecution witness giving false testimony at trial:

> We hold that upon a proper and timely motion under Rule 33, HRPP, a new trial must be granted by the trial court when it decides that (1) it is reasonably satisfied that the testimony at trial of a material prosecution witness is false; (2) defendant and his agents did not discover the falseness of the testimony until after the trial; (3) the late discovery is not due to a lack of due diligence by defendant or his agent; and (4) the false testimony is not harmless because there is a reasonable possibility that it contributed to the conviction.

5 Haw. App. at 96, 679 P.2d at 141 (footnote omitted).

falsely concerning the existence of other found property reports.  As there is a reasonable possibility the false testimony contributed to Stone's conviction, however, the ICA erred in ruling it harmless beyond a reasonable doubt.

Accordingly, we vacate the ICA's February 5, 2020 judgment on appeal and the circuit court's January 18, 2017 judgment of conviction and sentence, and remand this case to the circuit court for further proceedings consistent with this opinion.

## II.  Factual and procedural background

## A.    Circuit court proceedings

### 1.    Charge and pretrial

On April 6, 2016, Stone was charged via felony information with promoting a dangerous drug in the third degree in violation of HRS § 712-1243 (2014).[5]

---

[5]    HRS § 712-1243 states: "(1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.  (2) Promoting a dangerous drug in the third degree is a class C felony."

HRS § 712-1240 (2014) states in relevant part: "'Dangerous drugs' means any substance or immediate precursor defined or specified as a 'Schedule I substance' or a 'Schedule II substance' by chapter 329, or a substance specified in section 329-18(c)(14), except marijuana or marijuana concentrate."

HRS § 329-16 (2010) provides in relevant part:

> (a) The controlled substances listed in this section are included in schedule II.
>
> . . . .
>
> (e) Stimulants.  Any material, compound, mixture, or preparation which contains any quantity of the following
>
> (continued. . .)

The State provided five HPD reports to the defense in discovery. These reports, identified as Court's Exhibits A through E, were included in the record for appellate purposes only. Court's Exhibit A is Officer Korenic's April 5, 2016 four-page incident report numbered 16-136877, which listed six "Related Reports/Comments" numbered 16-121055, 16-121057, 16-121058, 16-121059, 16-121060, and 16-121061 ("six related reports") on its face page, and two related reports numbered 16-136880 (park closure) and 16-136878 (found property) in the narrative of the report. Court's Exhibit B is Officer Korenic's follow-up report numbered 16-136877. Court's Exhibit C is Officer Korenic's April 5, 2016 two-page incident report numbered 16-136880, which listed related reports numbered 16-136877 (Court's Exhibit A) and 16-136878 (Court's Exhibit D). Court's Exhibit D is an April 5, 2016 found property report numbered 16-136878 that lists an iPhone. Court's Exhibit E is a one-page handwritten found property report (or receipt) numbered 16-136878, listing only an iPhone (Court's Exhibits D and E are collectively referred to as the "iPhone Found Property Report").

---

(. . .continued)
    substances having a danger or probable danger associated
    with a stimulant effect on the central nervous system:

        . . . .

        (2) Any substance which contains any quantity of
            methamphetamine, including its salts, isomers,
            and salts of isomers[.]

## 2.    Jury trial

The circuit court held a jury trial on October 27 and 28, 2016.

### a.    Opening statements

In its opening statement, the State described what the evidence would show:

> Knowingly possess.  Ladies and gentlemen, what the evidence is going to show us through the course of this trial is that on April 5th, 2016, the defendant knew that he possessed methamphetamine, and that he tried to hide it.
> On April 5th, 2016 at about 3:45 in the morning, Officer Douglas Korenic was on patrol, and we're going to meet him during this trial and he's going to tell us about how that day he was patrolling the Ala Moana Beach Park here in Honolulu, State of Hawaii, and at that time he observed this defendant sitting at a park bench.  Well, not at a park bench, he was on the bench.  He was sitting on the table, on the picnic table, with his feet on the bench.  There's things on the table.
> And Officer Korenic is going to tell us how he approached the defendant.  He started asking him some questions and he's talking to the defendant, when all of a sudden the defendant makes a arm gesture.  He uses his arm and he flicks away a small baggie, which Officer Korenic knows and recognizes from his training and experience as a Honolulu Police Department officer, it contains a white crystalline substance, and he recognizes this substance to possibly be crystal methamphetamine.
>
> . . . .
>
> And ladies and gentlemen, what the evidence is going to show you is that that substance was, in fact, crystal methamphetamine, and even more so, that on April 5th, 2016, this defendant knew he had it, and then he tried to hide it.  Thank you.

In her opening statement, defense counsel explained the defense theory of the case:

> Now, at 3:45 in the morning, at Ala Moana Beach Park, I mean, it's still dark, it's not the safest place to be at that time.  You will see a picture, and in that picture it will show Mr. Stone's belongings, including his identification, various debit cards, credit cards, store cards, strewn all over the table.  Use your reason and

8

common sense.  Would anybody have all of their property thrown all over the table at 3:45 in Ala Moana Beach Park all by himself?  He's not the biggest guy.  You can see him.

The evidence will show that the very people charged with protecting us planted -- well, rifled through his belongings, and who knows, the baggie might have been there before, but it was not in Kentaru Stone's possession.  He did not know it was there.

I ask you to pay specific attention to those pictures because the pictures are neutral; they don't take any sides, they just show what is.

And the evidence will show that Mr. Stone, he probably upset the officers.  He has difficulty in hearing and in speaking, so when Officer Korenic approached him and asked for his identification, he probably didn't respond.  But Officer Korenic will testify that he was on bike patrol.  He came across Mr. Stone at approximately 3:45 in the morning.  He started asking him for his identification, and at approximately 10 minutes later, or 3:55 in the morning, that's when he observes Mr. Stone throwing the baggie.

Now, the baggie is the only evidence in this case, but I'd also take you -- I'd also ask you to look closely at those pictures, because on that bench table there's a clearly visible Hawaii driver's license with Mr. Stone's -- identifying Mr. Stone, so if the Officer was questioning him on his identification for ten minutes, when his identification was clearly in view, because the ID is a lot bigger and you can see the scale of it, it's a lot bigger than the little plastic baggie, which is approximately 1 and a half inches by 1 and 1/4 inches, so, I mean, he would've surely seen his identification on the table.

And as you hear the evidence, also consider that after recovering the baggie -- I mean, 'cause there were other items, there was a -- the bag.  The police officers did not request a search warrant to see if there were other drug paraphernalia or implementations.  They did not recover a lighter, they did not recover a scraper, they did not recover anything else related to that drug paraphernalia.

And ask yourself why they didn't get a search warrant.  Because they had already rifled through his stuff, they knew that there wasn't anything more, and Kentaru will testify to that.[6]

At the end of this case, there will be reasonable doubt, and we'll ask that you find Mr. Stone not guilty.

Thus, based on the discovery provided, defense counsel's theory of the case during opening statement was that because the iPhone Found Property Report was the only found property report

---

[6]    Stone ultimately decided not to testify.

produced in discovery, the other items on the picnic table shown in the photographic exhibits, which included an ID, belonged to Stone, and that Officer Korenic would therefore not be testifying truthfully by testifying he was unable to ascertain Stone's identity, when Stone's ID was visible right in front of him.  The defense theory was also that Officer Korenic had searched Stone's bag and had strewn Stone's belongings all over the table, as shown in the photographic exhibits, that Officer Korenic must have planted the methamphetamine baggie after rifling through Stone's bag or that the methamphetamine baggie was already there but did not belong to Stone, and that Officer Korenic did not seek a search warrant of the bag because he already knew there was no drug paraphernalia contained therein because he had already searched Stone's bag.

### b.    Officer Korenic's testimony

On October 27, 2016, Officer Korenic testified as follows.

On April 5, 2016, Officer Korenic was assigned to patrol Honolulu parks for park closure and rules violations.  At approximately 3:45 a.m., he was walking along the edge of the Ala Moana Beach Park when he saw a male, later identified as Stone, sitting on top of a picnic table approximately sixty feet inside the park boundary.  To address the park closure violation, he approached Stone, who was faced towards him. While approaching Stone, he saw many items on Stone's lap and on

the picnic table, and Stone was "[j]ust touching them, and I imagine he was maybe going through them or looking for something[.]"  The area was well lit by lights from the walkway.

Officer Korenic stopped approximately six feet away from Stone.  Because the HPD typically issued citations for park closure violations, but because it was also an arrestable offense, Officer Korenic asked Stone for his information.  Stone responded that he did not have identification, and when Officer Korenic asked "what his information was," Stone stated he had the right to remain silent.  After ten minutes of trying to get Stone's information, Officer Korenic told Stone that he would be arrested if he did not provide his identity.  Stone remained uncooperative.

Stone then threw "like a press seal type baggie, maybe an inch by an inch, maybe inch and a half at the largest, with his right hand," which landed to Stone's right on the picnic table.  Inside the baggie was "a white crystalline substance that, due to [his] training and experience," Officer Korenic "recognize[d] to be -- [] a narcotic."  He clearly saw the baggie because the area was well lit by lights from the walkway and his flashlight.  Officer Korenic placed Stone under arrest, and the baggie stayed on the table throughout the entire investigation.

Officer Korenic identified State's Exhibits 14 through 17, which were then admitted into evidence and published to the

jury.  State's Exhibit 16 is a photograph of the top of the picnic table with various IDs, membership cards, bank cards, and a bag strewn about on its surface.[7]  Stone was sitting in the area without items in State's Exhibit 16.  Officer Korenic verified ownership of the items depicted in State's Exhibit 16 through a "found property policy"; the items did not belong to Stone.  None of the individuals who owned these items were present in the park, none of those individuals approached the table when he saw Stone, and "they had to come later."

On cross-examination, Officer Korenic testified he could not have charged Stone for being in possession of other people's confidential personal information because Stone was not in possession of the items on the picnic table, as they were on the table.  He generated multiple found property reports for those items, as he had been trained in the academy to detail everything recovered.  When defense counsel asked about the iPhone Found Property Report being the only such report, Officer Korenic claimed there were several other found property reports for the other recovered items.

Defense counsel then showed Officer Korenic the five HPD reports that had been provided to the defense in discovery.

---

[7]    State's Exhibit 14 is a photograph of the picnic table in relation to the sidewalk.  State's Exhibit 15 is a photograph of the park bench at a closer view.  State's Exhibit 17 is a photograph of the methamphetamine baggie placed next to a penny for comparative size.

After reviewing the reports, Officer Korenic stated, "There is a report number that's not here."

The circuit court excused the jury, then held a bench conference regarding Officer Korenic's testimony that there was a missing report. Defense counsel stated that it appeared Officer Korenic was testifying to discovery that had not been provided to the defense. The State responded, "[T]he defense is in receipt of all reports received by the State from the police department. In reviewing the reports as turned over, there is no reference to other report numbers." Defense counsel then moved for mistrial:

> And generally in this situation, my understanding is if there are reports generated out of the same incident, there should be connecting reports referred to in the discovery, and there are not any.
> So I don't know if the officer is deliberately trying to fabricate something at this point or hiding additional reports, I don't know, but at this point, you know, we'd rely to our detriment in terms of questioning the officer. I mean, I feel compelled to move for a mistrial. I mean, I don't think the officer's been up front in -- or I mean HPD has been up front with disclosing everything to the defense at this point.

The circuit court did not rule on the oral motion for mistrial, instead stating:

> THE COURT: I mean, I understand your position. I'm not -- I don't think the record's there yet. I think I need more information. We can put the witness on the stand outside the presence of the jury, and you can try and establish a record for what you're arguing. Right now we're just speculating. He could just be wrong, we don't know. I mean, I think -- personally I'd like to know why does he think there's a report that's not here, and follow that trail wherever it leads.
>
> [DEPUTY PROSECUTING ATTORNEY]: Well, first, the State does acknowledge that usually if there is a connecting report, there's a reference to it, the State would receive it, and

13

> then turn it over in discovery.  All reports received by
> the State have been provided to the defense.
>
> THE COURT: I understand what you're saying, [deputy
> prosecuting attorney], but the witness has said something
> that's concerning, and I need to get to the bottom of it.

Officer Korenic was brought back for defense counsel to conduct voir dire.  Defense counsel asked, "So in the report that you submitted for this case, there is no mention of any connecting reports, correct?"  Having reviewed Court's Exhibits A-E, Officer Korenic responded, "Incorrect," stating there were six related reports listed on the front page of the incident report.  Because the State had not received the six related reports from HPD, the circuit court recessed for the State to procure them for defense review.

During the mid-trial recess, the State procured, and defense counsel reviewed, the six related reports.  The State indicated the missing related reports were irrelevant because they referred to another incident with another defendant. Defense counsel responded:

> Just so that the jury is not left with the belief that it
> pertains to my client, I would like the opportunity to at
> least clarify with the officer and -- because he had
> related that there were other reports that were, I guess,
> created with respect to the found property, and that these
> are not them basically.
>
> . . . .
>
> And these are not them, and they don't have to deal with my
> client.

Upon resuming cross-examination, Officer Korenic, having reviewed the six related reports procured during the mid-trial

14

recess, admitted they had nothing to do with Stone.  With respect to whether there were additional found property reports, however, the following exchange occurred:

> Q.  Also in your report, the last page of your report, there is a section entitled Related Reports, correct?
> A.  Yes, ma'am.
> Q.  And there are two report numbers under that report, correct?
> A.  Can I see it?  (Reviewing.)  Yes, ma'am.
> Q.  And those reports are for Park Closure under 16-136880 and Found Property, 16-136878, correct?
> A.  Yes, ma'am.
> Q.  And the found property report is the report that I had previously shown you, correct?
> A.  Yes, ma'am, I remember that.
> Q.  And the only item that was detailed in that report is the iPhone, correct?
> A.  Yes, ma'am.
> Q.  Other than that, there are no other found property reports in your --
> A.  That's correct.
> Q.  So there's no other itemization of any items that were recovered in your report, correct?
> A.  Not in that report, no.

(Emphasis added.)  Thus, Officer Korenic's testimony indicated there were other found property reports containing itemization of the items.  Officer Korenic also conceded there was no mention in his report that Stone had other people's IDs around him.

Despite seeing other people's IDs around Stone, Officer Korenic did not obtain a search warrant to search Stone's belongings.  He also did not obtain a search warrant to search for drug related paraphernalia after he saw the methamphetamine baggie.  There were no drug paraphernalia items on the picnic table, and there was no mention of drug paraphernalia, such as a

15

scraper, straw, lighter, or pipe, in his report; the only indication of a presence of drugs was the baggie.

On redirect examination, Officer Korenic clarified that the six related reports were not referenced in the narrative of his incident report, and only two related reports (park closure and iPhone Found Property Report) were referenced in the narrative. Although he was trained to document things like his observations or the elements of a crime, there were times he did not document some details, either through oversight or mistake. In this case, he had testified about what he did and observed from memory. He also answered in the affirmative when the State said, "I think it would be fair to say at this point that maybe there's some things that your report had that were mistakes." He did not, however, correct his previous testimony regarding the existence of other found property reports.

On recross-examination, Officer Korenic stated there was "some form of ID" in State's Exhibit 16 and he did not document that it was not Stone's ID and did not identify whose ID it was.

### c.   Officer Paclib's testimony

HPD Officer Nichole Paclib ("Officer Paclib"), a bike detail officer, testified as follows.

On April 5, 2016, at approximately 4:15 a.m., she responded to an incident at the Ala Moana Beach Park. Upon arrival, Officer Paclib saw Stone sitting on the picnic table, who was

with Officer Korenic.  Officer Korenic informed her Stone was being arrested; he pointed to the baggie on the picnic table and instructed her to recover it.  Officer Paclib placed the baggie into a manila envelope and sealed it with red evidence tape; she also took pictures of the scene.

On cross-examination, Officer Paclib testified that had she seen IDs or other cards not belonging to Stone, it would have raised a "red flag" and she would have documented those circumstances in her police report "[i]f it was pertaining to the case[.]"  She explained there were some personal items around the methamphetamine baggie, but she could not recall exactly what they were.  Her report did not state anything about IDs.  She did not see what transpired between Stone and Officer Korenic before her arrival.

On re-direct examination, Officer Paclib stated she did not spend time looking at the other items on the picnic table because her assignment was to recover the methamphetamine baggie.

### d.    Other testimony

The State's other witnesses testified as to the chain of custody and identification of the substance in the baggie, which are not at issue in this case.

### e.    Closing arguments and verdict

In its closing argument, the State argued that whether Officer Korenic made mistakes in the incident report did not matter:

> Now, the standard we know is beyond a reasonable doubt. And you might be wondering in your mind, well, in order to know that the defendant was in possession of the baggie, we have to rely on Officer Korenic's testimony. And we do know that, you know, he made some mistakes in that report, so how can I believe what he said?
>
> You know, he admitted that there were some mistakes. He left out maybe some related report numbers for the stuff that was on the table, maybe he didn't fully describe in his report, you know, what was on the table, what IDs there were, who they belonged to, but remember he told us that the purpose of these reports, it's meant to record the circumstances about what happened, what's relevant for that case. And this is what Officer Paclib told us too, you know, the purpose of that part of the report is to talk about what is relevant for what the issue is.
>
> And this case is, and always has been, about the possession of methamphetamine. And Officer Korenic told us that he was testifying from his memory, that he wasn't relying on what he had written six months ago, because he remembered what happened. But the report that he wrote recorded who the defendant was, where he was, what time it was, what was going on, what he was doing, what the defendant was doing, what the circumstances were, all related to this baggie of methamphetamine.
>
> Now defense might get up here and they might want you to believe that, you know, Officer Korenic and HPD, maybe they planted it, maybe they have nothing better to do with their time than to plant evidence, that they're not busy dealing with real crime, that they have to make up something, that Officer Korenic isn't busy enough patrolling the gigantic area that is Ala Moana Beach Park, as well as the other city and county public parks that he patrols, that he carries around little baggies of meth to plant on people. Seriously?
>
> They might want you to believe though that because there's mistakes in his report, that you can't believe anything that Officer Korenic said. And, yeah, you know what, he admitted he made some mistakes. He came back, he testified. He seemed a little embarrassed, maybe a little sheepish that these mistakes were pointed out, but he was clear about what he remembered, and making a mistake in your report does not make a conspiracy.
>
> Let's also talk a little bit about that other stuff on the picnic table. <u>Officer Korenic told us that they weren't the defendant's.</u> Defense might come up here and

> say that we don't really know whose it was.  But does it
> even matter? . . . .

(Emphasis added.)

In her closing statement, defense counsel maintained the defense theory of the case, emphasizing the lack of found property reports for the other items found on the picnic table:

> So let's take a look at the evidence presented in this case.  One of the key pieces of evidence in this case is this picture, a picture of the bench that Kentaru Stone was sitting at on -- in the early morning of April 5th. Now, if we take Officer Korenic's explanation as to where everything was positioned, Kentaru was sitting someplace around here, where there was no -- nothing on the table. Officer Korenic was positioned someplace over here, right in between the driver's license and Mr. Stone.
> Now, the driver's license is clearly visible in this picture, and it would've been right in front of Officer Korenic, and he was questioning Kentaru for approximately ten minutes.  And what you can see in the picture too is also the size of the ID versus the size of the little baggie, and there's a clear difference in size.  And, basically, if you're focused on getting someone's identification at this point, I mean, and an ID is clearly in front of you, you're going to see it.  It just doesn't make sense.
> It doesn't make sense that Kentaru would basically empty his wallet in Ala Moana Beach Park at 3:45 in the morning.  I mean, it's dark, it's dangerous, it's close to a bus stop.  He could get robbed at any time.  It just doesn't make sense that he would do this at 3:45 in the morning.
> It doesn't make any sense that Officer Korenic testified that the various cards and ID belonged to other people, because there's no inventory that was done, which would clearly have been relevant to this case or the other cases if he were going to return it.  There's no police reports for any of the IDs.  There's no mention of people's IDs, bank cards or club cards mentioned anywhere in his police report.
> And he did mention doing a found property receipt, and I questioned him, and you got to see his response on the record.  The only found property receipt that he put in his report was of the iPhone, nothing else.
> And why do you think he did that?  He probably saw this ID after the fact and had to come up with an explanation as to why it was right there and he didn't see it.  Officer Korenic basically went into Kentaru's things and rifled through it and just -- it was on the table, he took a picture of it, and only after the fact did he

19

realize that the ID was right there.  After all, a picture does say a thousand words.

.  .  .  .

Officer Korenic is not credible.  Officer Korenic knew he had to lie to tie Kentaru to the baggie and to establish knowing possession, and he distinguished that by -- in his testimony that said that's why they couldn't arrest him for sitting in a pile of other people's IDs, because he wasn't in possession of it.

The empty baggie did not belong to Kentaru Stone.  It might have been on the table, it might have been someplace in the area, but it's not defense's burden to say exactly where it came from.  It didn't belong to Kentaru, and Kentaru wasn't in knowing position [sic] of the meth residue in the bag.

.  .  .  .

Officer Korenic's testimony is contradicted by his own report, the fact that it doesn't mention that the IDs belonged to other people.  Officer Korenic's testimony is contradicted by the picture which shows Kentaru's ID clearly right in front of where he would've been --

.  .  .  .

So you can consider the picture and where Officer Korenic would've been right in front of where the ID is.

Officer Korenic's testimony is contradicted by his own actions, not obtaining a search warrant to search Kentaru's belongings for other IDs and related drug paraphernalia.

And Officer Korenic's testimony is contradicted by Officer Paclib, who testified that it would raise a red flag if she saw an ID that belonged to another individual. She took pictures of the picnic table with all of those IDs sprawled out.  Nothing about the IDs that were scattered on the table seemed to raise a red flag with her.

And in weighing credibility, you can consider whether they concern matters of importance or matters of unimportant detail, and whether they result from innocent error or deliberate falsehood.  Clearly, Officer Korenic's testimony regarding the IDs present on the table are an important detail, and he deliberately lied on the stand about them.

.  .  .  .

Hold the State to their burden in this case, proof beyond a reasonable doubt.  Not only do those discrepancies go to judging Officer Korenic's credibility, they go to the lack of evidence as well.  And let's talk a little bit about the lack of evidence.

Don't fill in the holes for the State.  Require them to provide you with enough credible evidence.  Where are

20

these reports for these other IDs?  Where are they?  The State has not proven their case beyond a reasonable doubt.

In rebuttal, the State again argued that it did not matter who the items belonged to, and that Officer Korenic was credible despite the mistakes made in his incident report:

> Ladies and gentlemen, the defense seems to revolve around this photograph, which is State's Exhibit 16, and they're asking you to look at what's in it and identify what they are, who they belong to.  But the reality is it doesn't actually matter, because even if the defendant had been sitting right next to his driver's license, if an officer asks you for your identification, how's he supposed to know that that's yours without you picking it up and handing it to him?
>
> All of that is to distract you from what the real question in this case was, is if the defendant possessed methamphetamine on April 5th, 2016.  No ques—- it's not about if he possessed other IDs or if he possessed the bag that's sitting on the bench, if he possessed any of the other cards that are depicted in State's Exhibit 16, but it's whether or not he did possess this little baggie.  And we do know exactly where it came from.  It came from the defendant's hand, his hand attached to him.
>
> . . . .
>
> And if we believe what the defense is arguing, that Officer Korenic isn't believable because he made some mistakes in his report, then we are actually holding him to a different standard, a higher standard, a standard where his report would need to be flawless in order for us to believe him.
>
> . . . .
>
> Officer Korenic, you know, he made some mistakes in his report, he admitted that to you, but he's human, and he is not to be held to a different standard just because he wears a uniform.

On October 28, 2016, the jury found Stone guilty of the charged offense.

### 3.   Motion for new trial

#### a.   Motion

Stone filed his motion for new trial under HRPP Rule 33. In relevant part, Stone argued he was entitled to a new trial because "'justice' was not served."  He contended he did not have the benefit of newly discovered evidence, namely Officer Korenic's found property reports, or, in the alternative, information regarding the lack thereof.  He also argued trial courts have an affirmative duty to grant a new trial if they are convinced that a miscarriage of justice would result by allowing the verdict to stand.

#### b.   Memorandum in opposition

In her declaration attached to the State's opposition memorandum, the deputy prosecuting attorney stated:

> Officer Korenic pointed out that on the face page of his report there were listed six (6) additional police report numbers that were not included in the body of Officer Korenic's report and were not in the State's possession. The State was not aware of these reports prior to Officer Korenic pointing them out.

The deputy prosecuting attorney also stated: "Subsequent to trial, this Declarant looked for the alleged property reports and, as of this filing [November 23, 2016], has been unable to locate them."  (Emphasis added.)

The State contended, however, that the jury was the sole judge of the credibility of the witnesses and the weight of the evidence, and Stone did not present any new information

warranting a new trial.  The State maintained that after being cross-examined, Officer Korenic later retracted his position and admitted he may have made mistakes in his incident report. Stone then continued with his theory and, during closing argument, argued Officer Korenic was not credible because of the mistakes he made in his report, and the miscellaneous items belonged to him and that Officer Korenic could have easily looked at them when questioning him.[8]  According to the State, because Stone proceeded to trial with a specific theory centered on his ownership of the items on the picnic table and was able to fully present that defense to the jury, there was no miscarriage of justice.[9]

The State also asserted that ownership of the miscellaneous items and IDs was not material or relevant to this drug possession case.  It argued that it was only required to disclose material and relevant evidence and the six missing related reports were not material because they would not have affected the outcome of trial.

The State also noted that in the declaration of counsel in support of Stone's motion for new trial, defense counsel stated

---

[8]     The State also asserted that had Officer Korenic examined the IDs on the picnic table, that examination may have raised possible privacy and suppression issues before trial.

[9]     The State also argued Stone was not entitled to a new trial under HRS § 635-56 (2016), as the jury's verdict was not "manifestly against the weight of the evidence."

"the miscellaneous IDs were not mentioned in Officer Korenic's police report, no inventory of the ID[]s were included in the discovery provided to Defense, in fact the miscellaneous ID[]s were not mentioned anywhere in the discovery."  The State noted that during the mid-trial recess, it located the missing related reports and provided them to Stone.  It argued those reports proved to be irrelevant, that Stone acknowledged there was no mention of any other reports in Officer Korenic's incident report, and that Officer Korenic's incident report neither confirmed nor denied Stone's ownership of the miscellaneous items and IDs.  Instead, the State contended, the only evidence the other found property reports existed was Officer Korenic's testimony, which he admitted could have been a mistake.  It also noted Stone did not request additional discovery be conducted during trial.

Arguing that ownership of the IDs was irrelevant, the State contended Stone failed to establish how his mistaken belief impacted his right to a fair trial.  Although conceding Officer Korenic's reports did not state who owned the miscellaneous items, the State argued that Stone making an erroneous inference did not equate to the denial of a fair trial; his choice to build his defense around a "belief" was his trial strategy.

24

### c.    Hearing on motion for new trial

On December 27, 2016, the circuit court heard Stone's motion for new trial.  Stone argued that Officer Korenic's testimony "caught the defense quite off guard" and came as "quite a shock to the defense":

> [DEFENSE COUNSEL]: Yes, Your Honor.  In light of the evidence that came out at trial, namely the testimony of --
>
> THE COURT: The officer.
>
> [DEFENSE COUNSEL]:  -- the officer, Officer [Korenic's] testimony that, I guess, he had prepared these reports regarding the found property of other people that were located on the picnic table, I realized that we did take a recess in order to research the connecting reports that he had referenced on the front sheet of his report, and they were unrelated in nature.
> This caught the defense quite off guard as it was not -- these found property reports were not disclosed in the discovery that was received.  In talking with my client and in preparation for trial, it was defense's argument and belief and position that the IDs and the various cards that were on the picnic table belonged to him.  Officer [Korenic's] testimony on the stand was in direct contrast of -- with that -- with our -- with the argument that we were going to present.  It did come as quite a shock to the defense since we were provided absolutely no notice.
> In addition, I believe in the State's response to our motion, they had indicated that there were no found property reports that the State could find when researching this particular case, which is significant for the jury because I believe that the State argued to the jury that these cards did not belong to the defendant.
> Defense would be in a much stronger position if the defense could argue to the jury that there were actually no reports that were generated by the police officer that could be found within the HPD system.  I believe it directly goes to Officer [Korenic's] credibility as he would have basically been caught in a lie in terms of his response to defense's question regarding those found property receipts.
> The defense did do a partial impeachment of him, but without the jury or without being able to establish to the jury that there were actually no reports generated, I believe that puts us at a disadvantage because I don't know what the jury believed in terms of if they believed the officer that he actually did do these reports or -- and there was no way to establish at that point that these reports, in fact, did not exist.

25

> And I believe that it would be outcome determinative. I think it does go -- this is basically a credibility contest between the defense and the officer. And I believe that his testimony contained a significant lie which was argued by the State in its closing argument to the jury in light of the fact that they did do the research afterwards and established that there was no found property reports that was ever prepared by this officer.
>
> So for those reasons, defense is arguing for a new trial in this case because it was basically only established mid-trial after Officer [Korenic's] response to defense's question that there was any reference to any of this found property reports.
>
> THE COURT: Okay. It's not that -- I mean, I understand that was --
>
> [DEFENSE COUNSEL]: And there was no way for us to prepare.

The circuit court indicated its doubt as to how the other found property reports would have impacted Stone's case:

> [THE COURT]: Let me finish my thought, bear with me. I understand things didn't unfold the way I think anyone would want them to unfold. But what I'm trying to get a grasp on is what difference would it really have made? I mean, this case came down to the officer comes upon the defendant in the park, he's asking him about ID. The officer's testimony is clear that he was getting resistance to his request for ID. It was after hours so he was -- whoever was there, regardless of ID or not, he was not supposed to be there so the officer had a legitimate basis to be asking for ID. And then when he informed the defendant he was going to arrest him, he throws the packet away that has drugs in it.
>
> So that's a pretty simple story so I'm trying to see how the found property reports might have really had an impact on any of that.

Defense counsel responded that Officer Korenic's testimony concerning the existence of other found property reports undermined the defense theory:

> And the defense's whole theory of the case and its argument to the jury was premised on the fact that there was an ID that was right between where the defendant was seated and the officer, and he was asking my client for an ID for a period of about ten minutes. If the jury were to believe that the ID on the picnic table was my client's ID, that would raise serious questions as to the credibility of the officer's testimony that he was asking for -- my client for an ID and the ID was right in front of him.

26

. . . .

> And, again, this all happened, you know, like midway through the trial, during questioning that happened. I was unprepared for the officer's response and they got the benefit of the fact that the State was able to argue that this property did not belong to the defendant and was unable -- and -- and defense was unable to establish that there was actually no report that was generated at all by this officer.

The State then responded to Stone's arguments:

> First, the State did not argue in closing argument that the property did, in fact, belong to the defendant. The closing argument of the State in part was that we don't actually know who the owner -- what the ownership of these IDs and other miscellaneous items truly was because Officer [Korenic] testified at first it was the defendant, but upon being pointed out that may have been erroneous, he did concede that his report does not contain, in fact, who it belonged to.
> So his reports were, in fact, silent as to whether or not those items did or did not believe -- belong to the defendant. Any inferences drawn therefrom is not the responsibility of the State.
> Secondly, the defense did present argument during closing argument that the ID on the picnic table did, in fact, belong to the defendant. She pointed to the photograph and asked the jury to draw their own conclusions as to who they truly belonged to. So the defense was not, in fact, precluded from presenting their arguments as originally anticipated.
> Furthermore, even if their argument had, I guess, relied on the fact that the ID on the table belonged to the defendant, Officer [Korenic] would not have been in a position legally to simply just look at that ID out of privacy concerns for the items. Under the law there are proper procedures for doing so.
> Basically, what it comes down to is the defense does not point to any specific prejudice suffered as a result of the trial and, thus, the motion for new trial should not be granted.

In rebuttal, Stone argued that whether Officer Korenic filed other found property reports was material because it went to Officer Korenic's credibility, whether Officer Korenic followed proper police procedure, and prevented Stone from fully presenting his defense to the jury.

The circuit court denied the motion for new trial, stating:

> THE COURT: But what's the big deal about whether or not there's a found property report? I mean, basically there was testimony that there was stuff on the table. Whether there was a found property report or not might be of interest to --
>
> [DEFENSE COUNSEL]: Because he --
>
> THE COURT: -- might be of interest to attorneys, but is the jury really going to care?
>
> . . . .
>
> THE COURT: All right. All right, I've got it. All right. The motion is denied. I mean, I just don't -- you know, an appellate court wants to correct me, that's fine, I stand corrected. But I'm just not seeing how this information would have changed the heart -- I mean, the heart of this trial was police officer comes across Mr. Stone in the park, it's after hours, tries to get ID, testifies that Mr. Stone is resisting him, he tells him I'm going to arrest you, throws away the drugs.
>         It's a very simple picture. And, you know, whether he should have done a closing report or shouldn't have done a closing report, I just do not -- I cannot find that it was -- there's any reasonable possibility that that would have made any difference to the jury's determination. Motion is denied.

### 4.   Sentence and appeal

On January 18, 2017, the circuit court sentenced Stone to a five-year imprisonment term and filed its judgment of conviction and sentence. On February 16, 2017, Stone appealed the circuit court's judgment of conviction and sentence to the ICA.

## B.   ICA proceedings

In his appeal to the ICA, Stone raised a single point of error:

> The trial court erred in denying Stone's motion for new trial based on the post-trial revelation that Officer Korenic had not written any "found property" reports for the several ID and credit-type cards shown in photo S-Exh.16, contrary to his unrebutted trial testimony that (1) he had written such reports; (2) that the cards did not

28

belong to Stone; and (3) the cards were reclaimed by their owners, because his credibility was critical to the State's case, and Stone was prejudiced by his inability to marshal this information before the jury.

Specifically, Stone argued that he met the four-part test the ICA established in <u>Teves</u> for granting a new trial based on a prosecution witness giving false testimony at trial:

> We hold that upon a proper and timely motion under Rule 33, HRPP, a new trial must be granted by the trial court when it decides that (1) it is reasonably satisfied that the testimony at trial of a material prosecution witness is false; (2) defendant and his agents did not discover the falseness of the testimony until after the trial; (3) the late discovery is not due to a lack of due diligence by defendant or his agent; and (4) the false testimony is not harmless because there is a reasonable possibility that it contributed to the conviction.

5 Haw. App. at 96, 679 P.2d at 141 (footnote omitted). Stone also argued his right to a fair trial was violated because the State failed to correct Officer Korenic's false testimony.[10]

In its November 27, 2019 SDO, the ICA ruled in relevant part as follows.

The ICA concluded Stone met the first <u>Teves</u> requirement. <u>Stone</u>, SDO at 5. The ICA noted Officer Korenic was a material prosecution witness, as he was the only witness to Stone's possession of the methamphetamine. <u>Id.</u> The ICA concluded

---

[10]    Stone also argued he met the <u>McNulty</u> test, <u>see</u> <u>supra</u> note 3, which we do not further address due to applicability of the <u>Teves</u> test to the circumstances of this case.

For the first time on appeal, Stone also argued the evidence of the other people's IDs was prejudicial evidence of other crimes under Hawai'i Rules of Evidence ("HRE") Rule 404(b) (1994) that should have been excluded under HRE Rule 403 (1980). Because we vacate Stone's conviction on other grounds, we do not address this argument.

Officer Korenic's testimony was false,[11] as he testified to the existence of found property reports which were not referenced in his reports.  Id.  Stating there was no evidence these reports existed other than Officer Korenic's testimony, the ICA concluded Stone demonstrated a material prosecution witness provided false testimony.  Id.

As to the second Teves requirement, the ICA concluded the falsity of the testimony was discovered during trial.  Id.  The ICA stated that during a mid-trial recess, after Officer Korenic testified he had submitted found property reports for the IDs, the State caused a search for the related reports Officer Korenic testified were missing, but the related reports had nothing to do with Stone's case.  Id.  The ICA noted Stone cross-examined Officer Korenic on the fact that his written reports did not corroborate his assertion that found property reports were submitted for the IDs found at the scene and the only found property report mentioned in Officer Korenic's report was for an iPhone.  Id.  As such, the ICA concluded Stone failed to meet the second Teves requirement, and the fact that the State conducted a further search and still found no reports did not change its conclusion.  Id.

---

[11]    The ICA stated that false testimony is "[t]estimony that is not true[,]" and is broader than perjury because it lacks a state of mind element.  Stone, SDO at 5 (alterations in original) (quoting False Testimony, Black's Law Dictionary (11th ed. 2019)).

As to the third Teves requirement, the ICA concluded that even if the false testimony had not been discovered at trial, any failure of the defense to discover the false testimony may have been due to a lack of diligence. Stone, SDO at 5-6. Noting that although defense counsel seemed to be surprised by the lack of the found property reports, the ICA stated discovery provided to the defense clearly showed IDs belonging to different people were found at the scene, and the incident report identified related reports numbers for which no copies were provided. Stone, SDO at 6. The ICA stated that, had the defense requested discovery of those missing reports, it would have discovered no found property reports regarding the IDs were created, which would have placed the defense in a better position to challenge Officer Korenic's testimony that found property reports for the IDs existed. Id.

As to the fourth Teves requirement, the ICA concluded there was no reasonable possibility Officer Korenic's false testimony contributed to Stone's conviction because Stone was able to fully cross-examine Officer Korenic on the absence of the found property reports. Id. The ICA reasoned Officer Korenic's false testimony provided an avenue for attacking his credibility that otherwise would not have been open to Stone. Id. It noted that in closing argument, Stone "thoroughly attacked" Officer

Korenic's testimony and the lack of reports supporting the existence of other people's IDs.  Id.

Accordingly, the ICA ruled that the circuit court did not abuse its discretion by denying Stone's motion for new trial and affirmed the circuit court's January 18, 2017 judgment.  Id. The ICA filed its judgment on appeal on February 5, 2020.

**C.   Certiorari application**

In his March 5, 2020 application for writ of certiorari, Stone asks this court to vacate the ICA's February 5, 2020 SDO.

**III. Standard of review**

**A.   Motion for new trial**

> As a general matter, the granting or denial of a motion for new trial is within the sound discretion of the trial court and will not be disturbed absent a clear abuse of discretion. . . . .  The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

State v. Yamada, 108 Hawai'i 474, 478, 122 P.3d 254, 258 (2005).

**IV.  Discussion**

**A.   The ICA erred in ruling that Stone failed to meet the Teves test**

As held by the ICA in Teves,

> upon a proper and timely motion under Rule 33, HRPP, a new trial must be granted by the trial court when it decides that (1) it is reasonably satisfied that the testimony at trial of a material prosecution witness is false; (2) defendant and his agents did not discover the falseness of the testimony until after the trial; (3) the late discovery is not due to a lack of due diligence by defendant or his agent; and (4) the false testimony is not harmless because there is a reasonable possibility that it contributed to the conviction.

32

5 Haw. App. at 96, 679 P.2d at 141 (footnote omitted).

The ICA correctly concluded that Stone satisfied the first Teves requirement, that "[the trial court] is reasonably satisfied that the testimony at trial of a material prosecution witness is false[.]"

As to the second Teves requirement, that "defendant and his agents did not discover the falseness of the testimony until after the trial," however, the ICA incorrectly concluded Stone discovered the falsity of Officer Korenic's testimony during trial. After Officer Korenic falsely testified, the circuit court took a mid-trial recess so the State could search for the six related reports that the HPD did not provide to the State after he asserted a report number was missing. The six related reports were irrelevant to Stone's case. Stone cross-examined Officer Korenic regarding the inconsistency of his written reports with his testimony that other found property reports existed. However, Officer Korenic persisted in his testimony that there was at least one additional found property report. Stone then filed a motion for new trial, indicating a lack of awareness of whether additional found property reports actually existed. It was not until the State's response to the motion for new trial that the lack of any additional found property reports was established. Therefore, Stone discovered Officer

Korenic's false testimony after trial, meeting the second Teves requirement.[12]

The ICA also incorrectly ruled as to the third Teves requirement, that "the late discovery is not due to a lack of due diligence by defendant or his agent." The ICA stated that although defense counsel was apparently surprised by the lack of the found property reports, discovery provided to the defense showed the IDs belonged to different people. State's Exhibit 16, which showed the top of the picnic table and the various cards strewn about it, showed at least three IDs. Noting that Officer Korenic's incident report identified the six related reports not provided in discovery, the ICA concluded that had the defense requested discovery of those missing reports, it would have discovered that no found property reports regarding the IDs were created, and if the defense had done so, it would have been in a better position to better challenge Officer Korenic's false testimony.

The ICA's analysis is misfocused. The third Teves requirement pertains to whether the late discovery of Officer Korenic's false testimony was due to a lack of due diligence by Stone or defense counsel. Even if Stone had requested the six missing related reports, which had nothing to do with his case,

---

[12]    As the ICA also correctly stated, the fact that the State conducted a further search and still did not find reports related to his case does not change this conclusion.

and therefore assumed that there were no additional found property reports generated regarding the items on the table, he would not have been able to ascertain through due diligence that Officer Korenic would testify falsely at trial that he had generated additional found property reports for the other items.

The ICA also erred as to the fourth Teves requirement, that "the false testimony is not harmless beyond a reasonable doubt because there is a reasonable possibility that it contributed to the conviction."  The ICA stated Officer Korenic's false testimony "provided an avenue for attacking his credibility that otherwise would not have been open to Stone."  Stone, SDO at 6. Yet, Officer Korenic's persistence in his false testimony directly undermined the defense's theory of the case. Therefore, there was a reasonable possibility that the false testimony could have contributed to Stone's conviction.  Hence, Officer Korenic's false testimony was not harmless beyond a reasonable doubt.

Therefore, the ICA erred in ruling Stone failed to meet the Teves test and in affirming the circuit court's denial of his motion for new trial.  The circuit court abused its discretion because Stone was entitled to a new trial based on the Teves test.

**B.   Stone's due process right to a fair trial was violated**

Stone also argues that his due process rights were violated because Officer Korenic's false testimony deprived him of his right to fair trial.  In 2018, after Stone's reply brief but before the ICA's SDO and Stone's certiorari application, we decided Birano.  Although Birano was decided after Stone's reply brief, due process principles regarding Stone's right to a fair trial are fundamental, and we address his contention that his right to a fair trial was violated.

"A defendant's right to due process is guaranteed by the Fourteenth Amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution."  Birano, 143 Hawai'i at 181, 426 P.3d at 405.  "'[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the' constitutional dictates of due process."  Id.  "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  Id.

Officer Korenic falsely testified that he had generated other found property reports for the miscellaneous items on the picnic table.  During Stone's cross-examination, Officer Korenic persisted in his false testimony that other found property reports existed for the other items on the picnic table.  Although Officer Korenic later admitted upon State questioning

that "there's some things that [his] report had that were mistakes," that testimony related to the fact that he listed six completely unrelated police reports in his incident report regarding Stone.  Officer Korenic's cross-examination testimony that other found property reports existed was therefore never corrected.

With respect to a prosecutor's obligations, we have noted that "[t]he most rudimentary of the access-to-evidence cases impose upon the prosecution a constitutional obligation to report to the defendant and to the trial court whenever government witnesses lie under oath."  143 Hawai'i at 189, 426 P.3d at 413 (alteration in original).  "This principle 'does not cease to apply merely because the false testimony goes only to the credibility of witnesses.'"  Id.  We have stated:

> It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt.  A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he [or she] knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.

Id. (ellipsis and alteration in original).  "'[T]he crux' of a due process violation arising from a prosecutor's failure to correct false testimony is the 'deception' of the finder of fact[.]"  Id. (first alteration in original).  "[A] prosecutor's constitutional duty to correct testimony is triggered even when

a witness's testimony is 'at best misleading.'"  143 Hawai'i at 190, 426 P.3d at 414.

In this case, it appears the deputy prosecuting attorney did not know about the falsity of Officer Korenic's testimony that additional found property reports existed before trial concluded.  As we stated in Birano, however, "the good faith of the prosecutor in failing to correct false testimony regarding impeachment material has no bearing on whether a defendant received a fair trial as required by due process[.]"  143 Hawai'i at 189, 426 P.3d at 413.  Thus, Stone's due process right to a fair trial was implicated by the lack of a correction of Officer Korenic's false testimony before conclusion of trial.

The violation of Stone's right to a fair trial is also subject to the harmless beyond a reasonable doubt analysis. "[A] violation of a constitutional right is subject to the harmless-beyond-a-reasonable-doubt standard.  This standard requires a court to 'examine the record and determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction.'"  State v. Tetu, 139 Hawai'i 207, 225, 386 P.3d 844, 862 (2016) (citation omitted). For the reasons discussed in our analysis of the fourth Teves requirement as applied in this case, there was a reasonable possibility that Officer Korenic's false testimony contributed to Stone's conviction.  Hence, Officer Korenic's false testimony

38

was not harmless beyond a reasonable doubt, resulting in the violation of Stone's due process right to a fair trial.

## V.   Conclusion

For the reason above, we vacate the ICA's February 5, 2020 judgment on appeal and the circuit court's January 18, 2017 judgment of conviction and sentence and remand to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Shawn A. Luiz,<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Brandon H. Ito<br>(on the briefs),<br>for respondent | /s/ Sabrina S. McKenna |
| | /s/ Richard W. Pollack |
| | /s/ Michael D. Wilson |

